**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| MEYER BURGER (HOLDING) CORP., *et al.*,[1] | : | Case No. 25-11217 (CTG) |
|  | : |  |
| Debtors. | : | (Jointly Administered) |
|  | : |  |

**COMBINED JOINT CHAPTER 11 PLAN OF LIQUIDATION AND DISCLOSURE STATEMENT
OF MEYER BURGER (HOLDING) CORP. AND ITS DEBTOR AFFILIATES AND THE OFFICIAL
COMMITTEE OF UNSECURED CREDITORS**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number are: Meyer Burger (Holding) Corp. (6127), Meyer Burger (Arizona) LLC (7456), Meyer Burger (Americas) Ltd. (8027), and Meyer Burger (Americas) Lease Co., LLC (4900). The location of the Debtors' service address for purposes of these chapter 11 cases is: 1166 Avenue of the Americas, 15th Floor, c/o FTI Consulting, Inc., New York, New York 10036.

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ....................................................................................................................iv

IMPORTANT NOTICES ................................................................................................................v

INTRODUCTION ..........................................................................................................................1

SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ..................................1

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME ...................2

    A.    Defined Terms ................................................................................................2

    B.    Rules of Interpretation and Computation of Time. .......................................10

ARTICLE II BACKGROUND AND DICLOSURES..........................................................................10

    A.    The Debtors' Corporate History and Business Overview .............................10

    B.    The AZ Module Production Facility .............................................................10

    C.    Colorado Cell Production Facility ................................................................11

    D.    Tax Credits Under the Inflation Reduction Act ............................................11

    E.    Prepetition Capital Structure ........................................................................12

    F.    Circumstances Leading to the Chapter 11 Cases ..........................................12

    G.    The Chapter 11 Cases ...................................................................................14

ARTICLE III CONSOLIDATION OF THE DEBTORS; CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...............................................................................................17

    A.    Consolidation of the Debtors .......................................................................17

    B.    Classification and Treatment of Claims and Interests ..................................17

    C.    Unclassified Claims .....................................................................................18

    D.    Classification of Claims and Interests ..........................................................19

    E.    Treatment of Claims and Interests ...............................................................20

    F.    Reservation of Rights Regarding Claims ......................................................22

    G.    Postpetition Interest on Claims .....................................................................22

    H.    Insurance .......................................................................................................22

    I.    Class Without Voting Claim Holders ............................................................22

ARTICLE IV CONFIRMATION AND VOTING PROCEDURES ........................................................23

    A.    Confirmation Procedures ..............................................................................23

    B.    Procedure for Objections ..............................................................................23

    C.    Requirements for Confirmation ....................................................................23

    D.    Classification of Claims and Interests ..........................................................23

    E.    Impaired Claims or Interests ........................................................................24

    F.    Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code ..................25

    G.    Feasibility .....................................................................................................25

    H.    Best Interests Test and Liquidation Analysis ...............................................26

ARTICLE V MEANS FOR IMPLEMENTATION OF THE PLAN ..................................................................27

    A.       Liquidation Trust ...........................................................................................................27

    B.       Corporate Actions .........................................................................................................31

    C.       Creation and Maintenance of Trust Accounts ..............................................................31

    D.       Preservation of Causes of Action ..................................................................................32

    E.       Cancellation and Surrender of Instruments, Securities and Other Documentation .........32

    F.       Effectuating Documents; Further Transactions..............................................................32

    G.       Substitution in Pending and Future Legal Actions.........................................................32

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES............................32

    A.       Assumption and Rejection of Executory Contracts and Unexpired Leases ....................32

    B.       Cure of Defaults for Executory Contracts and Unexpired Leases Assumed by the Liquidation Trust..................................................................................................................................33

    C.       Claims Based on Rejection of Executory Contracts and Unexpired Leases ....................33

    D.       Contracts and Leases Entered Into After the Petition Date ............................................34

    E.       Insurance Policies .........................................................................................................34

    F.       Reservation of Rights....................................................................................................34

ARTICLE VII CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING ...................................35

    A.       The Plan May Not Be Accepted.....................................................................................35

    B.       The Plan May Not Be Confirmed ...................................................................................35

    C.       Some or All of the Chapter 11 Cases May Be Converted to Chapter 7 ...........................35

    D.       Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections....................................................................................................................35

    E.       Objections to Classification of Claims...........................................................................35

    F.       Failure to Consummate the Plan ...................................................................................36

    G.       Debtor Release and/or Injunction Provisions May Not Be Approved ............................36

    H.       Reductions to Estimated Creditor Recoveries................................................................36

    I.       Certain Tax Considerations............................................................................................37

ARTICLE VIII PROVISIONS REGARDING DISTRIBUTIONS..............................................................42

    A.       Distributions for Claims Allowed as of the Effective Date..............................................42

    B.       Method of Distributions to Holders of Claims ...............................................................42

    C.       Disbursing Agent ..........................................................................................................42

    D.       Disputed Claims Reserves .............................................................................................43

    E.       Investment of Trust Accounts .......................................................................................43

    F.       Delivery of Distributions and Undeliverable or Unclaimed Distributions.......................43

    G.       Distribution Record Date ..............................................................................................44

    H.       *De Minimis* Distributions.............................................................................................44

    I.       Compliance with Tax Requirements ..............................................................................44

    J.       Manner of Payment Under the Plan ..............................................................................45

K.      Time Bar to Cash Payments ................................................................................45

L.      Setoffs .................................................................................................................45

M.      Allocation Between Principal and Accrued Interest ...........................................45

N.      Distributions to Holders of Disputed Claims .....................................................46

O.      Claims Paid or Payable by Third Parties ............................................................46

ARTICLE IX DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS .......................46

A.      Allowance of Claims ...........................................................................................46

B.      Prosecution of Objections to Claims ...................................................................46

ARTICLE X CONFIRMATION OF THE PLAN ......................................................................47

A.      Conditions Precedent to Confirmation ................................................................47

B.      Conditions Precedent to the Effective Date ........................................................48

C.      Waiver of Conditions to Confirmation or the Effective Date .............................48

D.      Effect of Nonoccurrence of Conditions to the Effective Date ............................48

E.      Nonconsensual Confirmation ..............................................................................48

F.      Effect of Confirmation ........................................................................................48

G.      Votes Solicited in Good Faith .............................................................................50

ARTICLE XI RETENTION OF JURSIDCTION .......................................................................51

ARTICLE XII MISCELLANEOUS PROVISIONS ...................................................................52

A.      Modification of the Plan ......................................................................................52

B.      Conversion or Dismissal of Certain of the Chapter 11 Cases .............................52

C.      Inconsistency .......................................................................................................52

D.      Exhibits and Schedules ........................................................................................52

E.      Exemption from Transfer Taxes ..........................................................................52

F.      Severability ..........................................................................................................53

G.      Successors and Assigns ........................................................................................53

H.      Service of Documents ..........................................................................................53

## TABLE OF EXHIBITS

| | |
|---|---|
| Exhibit A | Liquidation Analysis |
| Exhibit B | Committee Settlement Agreement |
| Exhibit C | Liquidation Trust Agreement (to be filed with Plan Supplement) |
| Exhibit D | Retained Causes of Action (to be filed with Plan Supplement) |
| Exhibit E | Assumed Executory Contracts (to be filed with Plan Supplement) |

**IMPORTANT NOTICES**

THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED THE DISCLOSURE STATEMENT AND THE SOLICITATION MATERIALS ACCOMPANYING THE PLAN. THE DISCLOSURE STATEMENT CONTAINED HEREIN IS BEING SUBMITTED BY THE DEBTORS FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS OF THE DATE HEREOF. THE INFORMATION IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.

THERE HAS BEEN NO INDEPENDENT AUDIT OF THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED PLAN AND DISCLOSURE STATEMENT EXCEPT AS EXPRESSLY INDICATED HEREIN. THIS COMBINED PLAN AND DISCLOSURE STATEMENT WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTORS' KNOWLEDGE, INFORMATION, AND BELIEF. NO GOVERNMENTAL AUTHORITY HAS PASSED ON, CONFIRMED, OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTORS SHOULD EVALUATE THE COMBINED PLAN AND DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE COMBINED PLAN AND DISCLOSURE STATEMENT AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

NOTHING STATED IN THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY.

**INTRODUCTION**

Meyer Burger (Holding), Corp., a Delaware corporation, and certain of its direct and indirect subsidiaries, that are debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or "Meyer Burger"), together with the Official Committee of Unsecured Creditors (the "Committee"), propose the following Combined Disclosure Statement and Chapter 11 Plan of Liquidation pursuant to sections 1121(a) and 1125(b) of the Bankruptcy Code (the disclosure statement portion hereof, the "Disclosure Statement," and the chapter 11 plan portion hereof, the "Plan," as may be modified and/or amended from time to time, and collectively, the "Combined Plan and Disclosure Statement").

On June 25, 2025 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (defined below) in the Bankruptcy Court (defined below). The Debtors have continued to manage their business and properties as debtors in possession during the pendency of these Chapter 11 Cases. On July 8, 2025, the Office of the United States Trustee for the District of Delaware appointed the Committee composed of the following creditors: (i) Amcor Flexibles Transpac BV; (ii) Fura Freight LLC; (iii) Shinyang Metal; (iv) Schrader Mechanical, Inc.; and (v) Synergy West, LLC.

Pursuant to the Plan, the Debtors and the Committee seek resolution of outstanding Claims against, and Interests in, the Debtors, and the liquidation of the Debtors' remaining assets through the establishment of a Liquidation Trust. The terms of the Plan are consistent with a global settlement among the Debtors, the Official Committee of Unsecured Creditors, certain secured parties, and the Putative WARN Claimants. This Combined Plan and Disclosure Statement contains, among other things, a discussion of the Debtors' history, prior businesses and operations, the Chapter 11 Cases, certain risk factors, a summary of the Plan, and a discussion of certain other related matters. Agreements and documents supplementing this Plan have been or will be Filed with the Bankruptcy Court. Such supplemental agreements and documents that are referenced in this Combined Plan and Disclosure Statement will be available for review.

This Plan constitutes a joint chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classifications and treatment of Claims and Interests apply to each individual Debtor on a consolidated basis for voting and distribution purposes. Each of the Debtors and the Committee are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE COMBINED PLAN AND DISCLOSURE STATEMENT IN ITS ENTIRETY, AND TO CONSULT WITH AN ATTORNEY, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

The classification of Claims and Interests against each Debtor pursuant to the Plan is as set forth below and as further detailed in Article III hereof. The information in the table below is provided in summary form for illustrative purposes only and is subject to material change based on certain contingencies, including those related to the Claims reconciliation process.

| Class | Claim/Interest | Status | Voting Rights | Projected Recovery |
|-------|---------------|--------|---------------|--------------------|
| 1 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2A | Non-WARN Priority Claims | Unimpaired | Not Entitled to Vote (Deemed to Accept) | 100% |
| 2B | WARN Priority Claims | Impaired | Entitled to Vote | [0% - TBD] |
| 3 | Prepetition and DIP Lender Secured Claims | Impaired | Entitled to Vote | [0% - TBD] |

| 4A | Prepetition Secured Lender Deficiency Claims | Impaired | Entitled to Vote | [0% - TBD] |
|---|---|---|---|---|
| 4B | General Unsecured Claims | Impaired | Entitled to Vote | [0% - TBD] |
| 5 | Interests | Impaired | Not Entitled to Vote (Deemed to Reject) | 0% |

# ARTICLE I
## DEFINED TERMS, RULES OF INTERPRETATION AND COMPUTATION OF TIME

**A.    Defined Terms**

Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bankruptcy Code, the Bankruptcy Rules, the Final DIP Order, DIP Credit Agreement, and/or Committee Settlement Agreement, as applicable. The following terms, when used in this Plan, shall have the meanings set forth below:

1.    "503(b)(9) Claim" means a Claim pursuant to section 503(b)(9) of the Bankruptcy Code for the value of goods received by the Debtors in the 20 days immediately prior to the Petition Date and sold to the Debtors in the ordinary course of the Debtors' businesses.

2.    "Administrative Expense Claim" means a Claim against a Debtor or its Estate for costs or expenses of administration of the Estates pursuant to sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 330(a) or 331 of the Bankruptcy Code, including Professional Fee Claims; and (c) all Statutory Fees.  In addition, 503(b)(9) Claims shall be treated as Administrative Expense Claims.

3.    "Affiliate" has the meaning set forth in section 101(2) of the Bankruptcy Code.  With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were a Debtor.

4.    "AHG" means the DIP Lenders and the Secured Lenders.

5.    "Allowed" means with respect to Claims: (a) any Claim (i) for which a proof of Claim has been timely Filed on or before the applicable Bar Date (or for which a proof of Claim is not required to be Filed pursuant to the Bankruptcy Code or a Final Order) or (ii) that is identified in the Schedules as of the Effective Date as not disputed, not contingent and not unliquidated, and for which no proof of Claim has been timely Filed; provided that, in the case of (i), any such Claim shall be considered Allowed only if and to the extent that no objection to the allowance thereof has been Filed by any applicable Claims objection deadline or such an objection has been Filed and the Claim thereafter has been Allowed pursuant to a Final Order; or (b) any Claim expressly deemed allowed by the Plan or allowed by a Final Order of the Bankruptcy Court (including pursuant to any stipulation or settlement agreement approved by the Bankruptcy Court).  Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered Allowed Claims.

6.    "Approved Budget" shall have the meaning ascribed to it in the Committee Settlement Agreement.

7.    "Avoidance Actions" means, collectively and individually, any and all preference actions, fraudulent conveyance actions and other claims or causes of action under sections 510, 542, 544 and 547 through and including 553 of the Bankruptcy Code and other similar state law claims and causes of action.

8.    "AZ Module Production Facility" means the 276,000-square-foot manufacturing plant and the nearby 218,451-square-foot warehouse for storing raw material and finished goods located in Goodyear, Arizona.

9.    "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

10.    "<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Delaware presiding over these Chapter 11 Cases.

11.    "<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable.

12.    "<u>Bar Date</u>" means the applicable bar date by which a proof of Claim or request for payment of administrative expenses must be, or must have been, Filed, as established by an order of the Bankruptcy Court, including the Bar Date Order and the Confirmation Order.

13.    "<u>Bar Date Order</u>" means the *Order (I) Establishing Bar Dates and Related Procedures for Filing (A) Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(B)(9) of the Bankruptcy Code) and (B) Administrative Expense Requests and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 322], entered by the Bankruptcy Court on October 17, 2025.

14.    "<u>Business Day</u>" means any day, other than a Saturday, Sunday or "<u>legal holiday</u>" (as defined in Bankruptcy Rule 9006(a).

15.    "<u>Cash</u>" means legal tender of the United States of America and equivalents thereof.

16.    "<u>Causes of Action</u>" means any action, claim, cause of action, controversy, demand, right, action, Lien, indemnity, interest, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, whether known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  For the avoidance of doubt, "<u>Cause of Action</u>" includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of contract, breach of fiduciary duty, violation of state or federal law or breach of any duty imposed by law or in equity, including securities laws, negligence and gross negligence; (c) the right to dispute, object to, compromise or seek to recharacterize, reclassify, subordinate or disallow Claims or Interests; (d) any Claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (e) any claim or defense including fraud, mistake, duress and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (f) any state or foreign law fraudulent transfer or similar claim

17.    "<u>Chapter 11 Cases</u>" means the above-captioned chapter 11 cases of the Debtors, jointly administered for procedural purposes.

18.    "<u>Claim</u>" has the meaning set forth in section 101(5) of the Bankruptcy Code.

19.    "<u>Class</u>" means a class of Claims or Interests, as described in Article III of this Plan.

20.    "<u>Combined Hearing</u>" means the hearing held by the Bankruptcy Court on Confirmation of this Plan and final approval of the Disclosure Statement, as such hearing may be continued from time to time

21.    "<u>Committee Settlement Agreement</u>" means that certain order [Docket No. 431] and global settlement agreement approved by the Bankruptcy Court [Docket No. 431-1], attached hereto as Exhibit B.

22.    "<u>Confirmation</u>" means entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

23.    "<u>Confirmation Date</u>" means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

24. "<u>Confirmation Order</u>" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code and approving the Disclosure Statement on a final basis pursuant to section 1125 of the Bankruptcy Code.

25. "<u>Debtor Related Parties</u>" means Alex Zyngier and Richard Miller (in their capacities as independent directors of the Debtors), Justin D. Pugh, the Debtors' current accountants, auditors, investment bankers, consultants, and other professionals and advisors, who served in such roles following the Petition Date.

26. "<u>Deficiency Claim</u>" means a General Unsecured Claim for the difference between (a) the aggregate amount of an Allowed Claim and (b) the value received on account of the portion of such Allowed Claim that is an Other Secured Claim or a Prepetition Secured Lender Claim.

27. "<u>DIP Agent</u>" means GLAS USA LLC as administrative agent and collateral agent under the DIP Credit Agreement.

28. "<u>DIP Claim</u>" means the Claims of the DIP Secured Parties under the DIP Credit Agreement, DIP Loan Documents, Interim DIP Order, Final DIP Order, and Committee Settlement Agreement, as treated in accordance with the Committee Settlement Agreement and this Plan.

29. "<u>DIP Credit Agreement</u>" has the meaning given in the Final DIP Order.

30. "<u>DIP Lenders</u>" has the meaning given in the Final DIP Order.

31. "<u>DIP Secured Parties</u>" has the meaning given in the Final DIP Order.

32. "<u>Disbursing Agent</u>" means the Liquidation Trustee in its capacity as disbursing agent hereunder, or any Third Party Disbursing Agent.

33. "<u>Disputed Claim</u>" means:

    a. Claim that is listed on a Debtor's Schedules as either disputed, contingent or unliquidated, whether or not a proof of Claim has been Filed;

    b. Claim that is listed on a Debtor's Schedules as other than disputed, contingent or unliquidated, but the nature or amount of the Claim as asserted by the Holder in a proof of Claim varies from the nature or amount of such Claim as it is listed on the Schedules;

    c. Claim that is not listed on a Debtor's Schedules;

    d. Claim as to which the applicable Debtor or the Liquidation Trust has Filed an objection by any applicable Claims objection bar date, or any other party in interest has Filed an objection prior to the Confirmation Date, and such objection has not been withdrawn or denied by a Final Order; or

    e. Claim for which a proof of Claim or request for payment of Administrative Expense Claim is required to be Filed under the Plan or Bar Date Order and no such proof of Claim or request for payment of Administrative Expense Claim is or was timely Filed.

34. "<u>Disputed Claims Reserves</u>" means the reserve fund(s) established pursuant to Section VIII.D of this Plan.

35. "<u>Disclosure Statement</u>" means the disclosure statement (including all exhibits and schedules thereto or referenced therein) that relates to this Plan and has been prepared and distributed by the Debtors or Committee, as plan proponents, as conditionally approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

36.     "<u>Disclosure Statement Order</u>" means an order entered by the Bankruptcy Court conditionally approving the Disclosure Statement and allowing solicitation of votes to accept or reject this Plan.

37.     "<u>Distribution</u>" means a distribution under the Plan of property to a Holder of an Allowed Claim on account of such Allowed Claim.

38.     "<u>Distribution Date</u>" means a date selected by the Liquidation Trustee in accordance with the terms of the Plan to make Distributions on account of Allowed Claims.

39.     "<u>Distribution Record Date</u>" means the Confirmation Date.

40.     "<u>Earmarked Funds</u>" has the meaning set forth in the Committee Settlement Agreement.

41.     "<u>Effective Date</u>" means a day, as determined by the Debtors, which is the Business Day as soon as reasonably practicable after all conditions to the Effective Date set forth in Section X.B have been met or waived in accordance with Section X.C.

42.     "<u>Entity</u>" has the meaning set forth in section 101(15) of the Bankruptcy Code.

43.     "<u>Estate</u>" means, as to each Debtor, the estate created pursuant to section 541 of the Bankruptcy Code.

44.     "<u>Exculpated Parties</u>" means, collectively and in each case solely in such capacity, the Debtors, the Debtor Related Parties, the Committee and its members (solely in their capacity as members of the Committee), the Liquidation Trustee, the Professionals retained in these Chapter 11 Cases, and any other Entity or Entity's representatives who served as a fiduciary to the Debtors' estates during the pendency of the Chapter 11 Cases.

45.     "<u>Executory Contract</u>" means a contract to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code

46.     "<u>File</u>," "<u>Filed</u>" or "<u>Filing</u>" means file, filed or filing with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

47.     "<u>Final DIP Order</u>" means the *Final Order (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the Use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361, 362, 363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims, (V) Modifying the Automatic Stay* [Docket No. 94], entered by the Bankruptcy Court on July 17, 2025.

48.     "<u>Final Order</u>" means an order that is no longer subject to appeal or rehearing, except for the possibility of relief under Federal Rule of Civil Procedure 60 or Bankruptcy Rule 9024.

49.     "<u>Final Distribution Date</u>" means, with respect to a particular Class of Claims, the Distribution Date upon which final Distributions to claimants in the Class are to be made.

50.     "<u>General Unsecured Claim</u>" means a Deficiency Claim and any Claim that (a) is unpaid as of the Effective Date and (b) is not (i) an Administrative Expense Claim, (ii) a Priority Tax Claim, (iii) an Other Secured Claim, (iv) a Prepetition Secured Lender Claim, (v) a Professional Fee Claim, (vi) a Priority Claim, or (vii) a Claim otherwise expressly provided for with different treatment under this Plan.

51.     "<u>Governmental Unit</u>" has the meaning set forth in section 101(27) of the Bankruptcy Code.

52.     "<u>Holder</u>" means the legal or beneficial holder of a Claim or Interest.

53.     "<u>Impaired</u>" has the meaning set forth in section 1124 of the Bankruptcy Code.

54.     "Intercompany Claim" means any Claim against a Debtor held by another Debtor or Debtor Affiliate.

55.     "Insurance Policies" means, collectively, all insurance policies under which a Debtor is an insured party (including all related insurance agreements).

56.     "Interest" means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other ownership interest in any Debtor.

57.     "Interim DIP Order" means *Interim Order (I) Authorizing Debtor to Obtain Postpetition Financing, Pursuant to Section 364 of the Bankruptcy Code, (II) Authorizing the use of Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (III) Granting Adequate Protection to the Prepetition Secured Parties Pursuant to Sections 361,362,363, and 364 of the Bankruptcy Code, (IV) Granting Liens and Superpriority Claims (V) Modifying the Automatic Stay, and (VI) scheduling a Final Hearing* [Docket No. 46], entered by the Bankruptcy Court on June 26, 2025.

58.     "IRS" means the United States Internal Revenue Service.

59.     "Lien" has the meaning set forth in section 101(37) of the Bankruptcy Code.

60.     "Liquidation Trust" means the trust, as contemplated in the Committee Settlement Agreement as the "Litigation Trust," established on the Effective Date to, among other things, hold and liquidate Liquidation Trust Assets and to make Distributions to Holders of Allowed Claims in accordance with this Plan and the Liquidation Trust Agreement.

61.     "Liquidation Trust Agreement" means the trust agreement governing the Liquidation Trust, which shall be Filed as part of the Plan Supplement.

62.     "Liquidation Trust Assets" means all assets and rights to be transferred to the Liquidation Trust as provided in the Committee Settlement Agreement and this Plan, including, without limitation (i) all commercial tort claims held by the Debtors; (ii) all Retained Causes of Action; (iii) the Liquidation Trust Funding Reserve; (iv) the [New MB Equity Interest]; (v) Tax Refunds; (vi) all privileges held by the Debtors; and (vii) any remnant assets and claims not previously sold or released, including, without limitation, proceeds of insurance claims.

63.     "Liquidation Trust Beneficiaries" shall have the meaning ascribed to the term "Beneficiaries" in the Liquidation Trust Agreement

64.     "Liquidation Trust Expenses" subject to a budget to be agreed to by the AHG, means any and all reasonable fees, costs and expenses incurred by the Liquidation Trust or the Liquidation Trustee (or any professional or other Person retained by the Liquidation Trustee) on or after the Effective Date in connection with any of their duties under the Plan and the Liquidation Trust Agreement, including any administrative expenses and fees, such as attorneys' fees and expenses, insurance fees, taxes and other winddown expenses.

65.     "Liquidation Trustee Functions" means the functions and duties of the Liquidation Trust and/or the Liquidation Trustee set forth in Section V.A.5 of the Plan, or as otherwise provided in the Liquidation Trust Agreement.

66.     "Liquidation Trust Funding Reserve" means Cash in an amount equal to (i) $600,000, less Allowed Professional Fee Claims incurred in connection with plan preparation and plan confirmation, consistent with the Committee Settlement Agreement, plus (ii) the Earmarked Funds.

67.     "Liquidation Trust Indemnified Parties" means the Liquidation Trustee and its consultants, agents, attorneys, accountants, financial advisors, beneficiaries, estates, employees, officers, directors, principals, professionals, and other representatives, each in their capacity as such.

68.     "<u>Liquidation Trust Oversight Committee</u>" means the committee appointed pursuant to Section V.A.4 of this Plan to oversee the activities of the Liquidation Trust and the Liquidation Trustee.

69.     "<u>Liquidation Trustee</u>" means the trustee appointed by the AHG to administer the Liquidation Trust pursuant to this Plan and the Liquidation Trust Agreement.

70.     "<u>MBT AG</u>" means Meyer Burger Technology AG (SWX: MBTN), a publicly listed Swiss entity headquartered in Thun, Switzerland, which indirectly owns 100% of the equity in each of the Debtors.

71.     "<u>Meyer Burger Group</u>" means Meyer Burger and its non-debtor affiliates.

72.     ["<u>New MBHC Equity Interest</u>" means one common share of stock in Post-Effective Date MBHC.]

73.     "<u>Non-Prepetition Collateral</u>" has the meaning given in the Committee Settlement Agreement.

74.     "<u>Notice, Claims And Solicitation Agent</u>" means Kroll Restructuring Administration LLC.

75.     "<u>Other Secured Claim</u>" means any Secured Claim other than a Prepetition Secured Lender Claim or DIP Claim.

76.     "<u>Petition Date</u>" means June 25, 2025, the date on which the Debtors commenced these Chapter 11 Cases.

77.     "<u>Plan</u>" means this chapter 11 plan of liquidation for the Debtors, and all exhibits and Plan Supplement documents, as may be amended, modified, or supplemented.

78.     "<u>Plan Supplement</u>" means the compilation of documents that constitute exhibits to the Plan and that will be Filed prior to Confirmation, including the Liquidation Trust Agreement, the identity of the Liquidation Trustee, any Oversight Committee, the non-exclusive schedule of Retained Causes of Action, and any schedules of assumed or rejected contracts.

79.     ["<u>Post-Effective Date MBHC</u>" means the Debtor Meyer Burger (Holding) Corp., from and after the Effective Date.]

80.     "<u>Prepetition Agent</u>" means GLAS USA LLC as administrative agent and collateral agent under the Prepetition Credit Agreement.

81.     "<u>Prepetition Credit Agreement</u>" has the meaning given in the Final DIP Order.

82.     "<u>Prepetition Secured Lender Claims</u>" means the Allowed Claims of the Prepetition Secured Parties under the Prepetition Credit Agreement, as treated in accordance with the Committee Settlement Agreement and this Plan.  Also referred to as the "Allowed AHG Secured Claims" under the Committee Settlement Agreement.

83.     "<u>Prepetition Secured Parties</u>" has the meaning given in the Final DIP Order.

84.     "<u>Priority Claim</u>" means any Claim, other than an Administrative Expense Claim, a Priority Tax Claim, or a WARN Priority Claim, entitled to priority under section 507(a) of the Bankruptcy Code.

85.     "<u>Priority Tax Claim</u>" means a Claim of a Governmental Unit entitled to priority under section 507(a)(8) of the Bankruptcy Code.

86.     "<u>Professional</u>" means a retained professional in these Chapter 11 Cases under sections 327, 328, 363, or 1103 of the Bankruptcy Code, or otherwise compensated under section 503(b).

87. "Professional Fee Claim" means any Administrative Expense Claim for the compensation of Professionals and the reimbursement of expenses incurred by such Professionals through and including the Effective Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court. To the extent that the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's requested fees and expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Professional Fee Claim.

88. "Professional Fee Escrow Account" means an account funded by the Debtors with Cash as soon as possible after Confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

89. "Professional Fee Escrow Amount" means the aggregate amount of unpaid Professional Fee Claims relating to the period prior to and on the Effective Date in the amounts set forth in the Committee Settlement Agreement.

90. "Putative WARN Claimants" means Charles Gilbert and the individuals he purports to represent in the adversary proceeding commenced by the filing of the Class Action Adversary Proceeding Complaint (Adv. Pro. No. 25-51042 (CTG).

91. "Pro Rata" means, when used with reference to a distribution of property to Holders of Allowed Claims in a particular Class or any other specified group of Claims pursuant to this Plan, proportionately, so that with respect to a particular Allowed Claim in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim to the amount of such Claim is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims in such Class or group of Claims to the amount of all Allowed Claims in such Class or group of Claims. Until all Disputed Claims in a Class are resolved, Disputed Claims shall be treated as Allowed Claims in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims in such Class.

92. "Released Parties" means collectively, and in each case, in their respective capacities as such: (a) the Secured Parties; (b) the Committee (solely in their capacity as members of the Committee); (c) with respect to (a) through (b), such Entities' Representatives; and (d) the Debtor Related Parties.

93. "Releasing Parties" means collectively, and in each case, in their respective capacities as such: (a) the Debtors; (b) the Secured Parties; (c) the Committee; (d) all Holders of Claims who vote to accept or reject this Plan and who do not affirmatively opt out of the releases provided in the Plan; (e) all Holders of Claims that are not entitled to vote on this Plan and who affirmatively opt in to the releases provided in the Plan; and (f) with respect to each of the foregoing Entities in clauses (a) through (e), each such Entity's Representatives for which such Entity is legally entitled to bind such Representatives to the releases contained in the Plan under applicable non-bankruptcy law solely with respect to claims that such Representatives could have legally asserted on behalf of such Entities in clauses (a) through (e).

94. "Representatives" means, with respect to any Person or Entity, any current and former subsidiaries, officers, directors, managers, principals, members, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives and other professionals of such Person or Entity.

95. "Retained Causes of Action" means all Causes of Action of the Debtors' Estates not expressly released, sold, or otherwise disposed of pursuant to the Plan, the Committee Settlement Agreement, or the Confirmation Order, including any chapter 5 Causes of Action. For the avoidance of doubt, any claims against Alex Zyngier and Richard Miller, in their capacities as independent directors of the Debtors and any claims against the DIP Secured Parties or the Prepetition Secured Parties have been released pursuant to the Committee Settlement Agreement and shall not constitute Retained Causes of Action.

96. "Sale APAs" means all agreements for the purchase and sale of the Debtors assets during the Chapter 11 Cases.

97.     "Secured Claim" means a Claim that is secured by a Lien on property in which an Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to sections 506(a).

98.     "Secured Lender" means, collectively, the lenders who are party to the Prepetition Credit Agreement (or their successors or assigns).

99.     "Secured Parties" means, collectively, the Secured Lenders, the Prepetition Agent, the DIP Secured Parties, and the DIP Agent.

100.     "Secured Tax Claim" means a Secured Claim arising out of a Debtor's liability for any Tax.

101.     "Statutory Fees" means all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the United States Code to the extent applicable

102.     "Tax" means: (a) any net income, alternative or add-on minimum, gross income, gross receipts, gross margin, sales, use, *ad valorem*, value added, transfer, franchise, profits, license, withholding, payroll, employment, excise, stamp, occupation, premium, property, environmental, escheat, unclaimed property or windfall, profits, custom, duty or other tax, governmental fee or like assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state, local or foreign taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other Person.

103.     "Tax Refunds" means any tax refunds or credits to which any of the Debtors may be entitled on or after the Effective Date.

104.     "Third Party Disbursing Agent" means an Entity designated by the Liquidation Trustee, subject to the approval of the Oversight Committee, to act as a Disbursing Agent pursuant to Article VIII.B of this Plan.

105.     "Third Party Payment" means a payment made to the Holder of a Claim on account of such Claim by an Entity that is not a Debtor or the Liquidation Trust.

106.     "Trust Accounts" means the bank accounts established by the Liquidation Trustee for the receipt, holding, investment, and distribution of Liquidation Trust Assets.

107.     "Unexpired Lease" means a lease to which a Debtor is a party that is subject to assumption, assumption and assignment or rejection under section 365 of the Bankruptcy Code.

108.     "Unimpaired" means, when used in reference to a Claim, a Claim that is not Impaired within the meaning of section 1124 of the Bankruptcy Code.

109.     "U.S. Trustee" means the Office of the United States Trustee for the District of Delaware.

110.     "Voting Deadline" means April 6, 2026, at 4:00 p.m., prevailing Eastern Time, which is the deadline for submitting ballots to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code.

111.     "Voting Record Date" means February 25, 2026.

112.     "WARN Priority Claim" means any portion of the Claim asserted by the Putative WARN Claimants under the Worker Adjustment and Retraining Notification Act that is entitled to priority status under 11 U.S.C. § 507(a)(4)–(5), including any wage and benefit components within the statutory caps.

**B.**     **Rules of Interpretation and Computation of Time.**

For purposes of this Plan, unless otherwise provided herein: (i) each term, whether stated in the singular or the plural, includes both the singular and the plural; (ii) any reference in this Plan to an existing document means such document, as it may be amended, modified, or supplemented; (iii) any reference to an Entity as a Holder of a Claim includes that Entity's successors and assigns; (iv) the words "herein," "hereof," and "hereto" refer to this Plan in its entirety; (v) captions and headings are for convenience only and shall not affect interpretation; (vi) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply to the extent not inconsistent herewith; and (vii) Bankruptcy Rule 9006(a) shall apply to the computation of any period of time prescribed or allowed herein.

**ARTICLE II**
**BACKGROUND AND DICLOSURES**

**A.**     **The Debtors' Corporate History and Business Overview**

The Meyer Burger brand was at the forefront of solar technology for more than twenty-five years. MBT AG is a publicly listed Swiss entity headquartered in Thun, Switzerland that indirectly owns 100% of the equity in each of the Debtors. Meyer Burger (Holding) Corp., a Delaware corporation ("Holdings"), is a non-operating holding company for the Meyer Burger operations in the United States. Non-Debtor Meyer Burger (Switzerland) AG ("MB Switzerland") owns 100% of the equity in Holdings. MB Switzerland also owns the patents for the technology used in the AZ Module Production Facility and employs engineers that are familiar with the equipment in the AZ Module Production Facility. Holdings directly owns 100% of the equity in Meyer Burger (Arizona) LLC, a Delaware limited liability company, which owns 100% of the equity in Meyer Burger (Americas) Ltd. ("MBA"). MBA is the operator of the AZ Module Production Facility. Meyer Burger (Americas) Lease Co., LLC ("MB Lease Co.") is an Arizona limited liability company that serves as a lease holding company for the AZ Module Production Facility located in Goodyear, Arizona. MBA owns 100% of the equity in MB Lease Co.

**B.**     **The AZ Module Production Facility**

In order to advance its expansion into the American solar market, MBT AG, through its American subsidiary MB Lease Co., signed lease agreements for a state-of-the-art manufacturing facility and a warehouse in Goodyear, Arizona (i.e., the AZ Module Production Facility). Although the AZ Module Production Facility required certain updates to ensure seamless production of MBT AG's photovoltaic solar modules using its patented SmartWire Connection Technology (SWCT®), the location in Goodyear, Arizona was the ideal location to position Meyer Burger at the forefront of the U.S. solar industry. The AZ Module Production Facility, a 276,000-square-foot manufacturing plant (and a nearby 218,451-square-foot warehouse for storing raw material and finished goods), was expected to produce 150-200 megawatts of solar modules in 2024, 1.8 gigawatts in 2025, and 2.1 gigawatts thereafter.

The Debtors were the first tenant of the AZ Module Production Facility site, which initially was built as a traditional warehouse and was not equipped to house solar module production. The Debtors, therefore, had to transform the location, including the installation of lighting, plumbing, HVAC, electrical, and other facilities, as well as office space for sixty to seventy employees. Construction of the AZ Module Production Facility required approximately $60 million and twelve months to complete, with substantial additional funding needed for equipment.

The Debtors operated the AZ Module Production Facility pursuant to two leases: one for the manufacturing plant at 1685 S. Litchfield Road, Goodyear, Arizona 85338 (the "1685 Lease") and another for a warehouse at 2250 S. Litchfield Road, Goodyear, Arizona 85338 (the "2250 Lease"), both with landlord SL7 Industrial Acquisition, LP. MB Lease Co. is the tenant under the 1685 Lease and the 2250 Lease. MBA is a guarantor of all obligations under the 1685 Lease and the 2250 Lease.

At full capacity, the AZ Module Production Facility would have manufactured an estimated 10,000 solar modules daily and employed 600 individuals. The AZ Module Production Facility's design includes three production lines, two of which were partially installed as of the Petition Date and never achieved full production capacity. Although substantially all equipment for the third production line was on site, installation was delayed due to the Debtors' shifting business plan and deteriorating financial condition.

C.    **Colorado Cell Production Facility**

In addition to the AZ Module Production Facility, MBT AG increased its investment in the United States and began developing a facility in Colorado Springs, Colorado (the "CO Cell Production Facility") to produce and exclusively supply its Heterojunction (HIJ) solar cells for the AZ Module Production Facility. The strategic plan was to grow the global business by manufacturing and offering for sale a truly "Made in America" product that would be sold worldwide. At full capacity, the CO Cell Production Facility was expected to produce 2.23 gigawatts of solar cells monthly. Meyer Burger expected to receive $90 million from the City of Colorado Springs, Colorado and the State of Colorado to support the CO Cell Production Facility, along with an additional $200 million in equity financing from MBT AG. However, the development of the CO Cell Production Facility was discontinued due to, among other strategic business reasons, the inability to obtain necessary financing. Upon information and belief, one or more of the Debtors made one or more prepetition transfers (either directly or indirectly) to the landlord of the CO Cell Production Facility that may be subject to avoidance and thus pursued by the Liquidating Trust as a Retained Cause of Action, pursuant to Chapter 5 of the Bankruptcy Code.

Consequently, rather than manufacturing solar cells in the U.S. for integration into solar modules at the AZ Module Production Facility, the Debtors were required to source their solar cells from the 1.4 gigawatt solar cell production site in Thalheim (Bitterfeld-Wolfen), Germany (the "Bitterfeld Facility"), owned by non-Debtor affiliate Meyer Burger (Industries) GmbH ("MBI"). The Bitterfeld Facility is one of the few remaining solar cell production facilities in Europe. The focus on the development and financing of the aborted Colorado facility took away resources that otherwise could have been invested in the AZ Module Production Facility and also weakened the ability of MBT AG to meet the Debtors' changing needs.

D.    **Tax Credits Under the Inflation Reduction Act**

As a result of producing solar modules and cells in the United States, the Debtors were positioned to generate lucrative tax credits under the Inflation Reduction Act of 2022 (the "IRA"), which introduced, expanded, and modified tax credits for developers of renewable energy products and manufacturers of renewable energy technology. Specifically, the Advanced Manufacturing Production Credit in IRC Section 45X (the "Section 45X Credits") provides a tax credit for each eligible component produced and sold between January 1, 2023 and December 31, 2032. At full production of both solar modules and cells, the Debtors estimated that up to $1.295 billion in tax credits would be generated between 2024 and 2030. Because maximum production was never achieved, the Debtors were unable to monetize the estimated level of the available tax credits.

Notwithstanding that Meyer Burger's investment in the AZ Module Production Facility supported the creation of jobs in the United States, both the Debtors and their European affiliates have been materially affected by changing U.S. policies and the uncertainty facing the renewable energy industry as a result of changes in federal law. In particular, prior to the Petition Date, on May 22, 2025, the United States House of Representatives passed its version of the budget reconciliation bill known as H.R. 1, which contained proposed revisions that would phase out or eliminate the Section 45X Credits. This uncertainty about U.S. economic policies and their effects on renewable energy contributed to the stalled efforts of the Debtors and their European affiliates to effectuate an out-of-court restructuring and recapitalization of the global Meyer Burger business.

Subsequently, on July 4, 2025, President Donald Trump signed H.R. 1 into law as the One Big Beautiful Bill Act (the "OBBBA"). The OBBBA significantly modified the IRA's clean energy tax credits and incentives. While the OBBBA did not repeal the Section 45X Credits entirely, it made several important changes affecting solar manufacturers like Meyer Burger. The OBBBA eliminated the Section 45X credit for wind components produced and sold after December 31, 2027, and introduced new restrictions related to foreign entities of concern ("FEOC"). For taxable years beginning after July 4, 2025, taxpayers cannot be a prohibited foreign entity or receive material assistance from a prohibited foreign entity to claim Section 45X credits. These FEOC restrictions include limitations on entities associated with certain foreign countries, including China, Russia, North Korea, and Iran, as well as limitations on the use of materials sourced from such countries. The OBBBA also accelerated the phase-out of investment and production tax credits for wind and solar facilities, requiring facilities that begin construction after July 4, 2026 to be placed in service by December 31, 2027 to receive credits.

Further, on July 7, 2025, President Trump issued an Executive Order titled "Ending Market Distorting Subsidies for Unreliable, Foreign Controlled Energy Sources," which instructed the Secretary of the Treasury to strictly enforce the termination of clean electricity production and investment tax credits for wind and solar facilities, to issue revised guidance preventing circumvention of the "beginning of construction" period, and to immediately implement the enhanced FEOC restrictions. This combination of legislative changes and executive action created substantial uncertainty for the domestic solar manufacturing industry and has negatively impacted the outlook for renewable energy investments in the United States.

**E.      Prepetition Capital Structure**

As of the Petition Date, the Debtors' significant prepetition funded debt consisted of approximately $89 million borrowed under the Bridge Credit Agreement. Pursuant to the Bridge Credit Agreement, dated as of December 5, 2024 (as amended by that certain First Amendment, dated as of December 23, 2024, and subsequently amended through the Tenth Amendment, dated as of June 24, 2025), the Prepetition Lenders provided term loans on a joint and several basis. The Bridge Credit Agreement is secured by substantially all of the personal property (subject to customary exceptions) of the Debtors and a junior lien on certain collateral related to DESRI Equipment Financing Borrower, L.L.C. ("DESRI") and/or Babacomari Solar North, LLC ("Babacomari"). The collateral package of the Bridge Credit Agreement also includes assets of the non-U.S. Meyer Burger Group entities.

The Debtors are also funded by unsecured, intercompany loans between MBT AG as lender, and MBA, Meyer Burger (Holding) Corp., and Meyer Burger (Industry Americas) LLC, as borrowers. The total amount of intercompany loans outstanding as of the Petition Date was approximately $374 million. MBT AG pledged these intercompany loans to GLAS, as collateral agent, to secure the obligations under the Bridge Credit Agreement, and GLAS, by notice to MBT AG, exercised its right to collect all amounts owed under the intercompany loans. In the ordinary course of business, the Debtors historically incurred unsecured indebtedness to various suppliers, trade vendors, landlords, utility providers, and service providers, among others. As of the Petition Date, the Debtors' estimated outstanding trade payables and other unsecured debt are approximately $100 million, excluding any intercompany balances.

**F.      Circumstances Leading to the Chapter 11 Cases**

The Debtors entered the U.S. solar market with great expectations. Those expectations were never realized primarily due to their inability to secure adequate financing to complete construction of the AZ Module Production and CO Cell Production Facilities, which was necessary to meet expected production levels and to satisfy customer demands.

**1.      Financing Difficulties**

To fund the construction and development of the AZ Module Production Facility and CO Cell Production Facility, Meyer Burger anticipated funding from multiple sources, including approximately $370 million in intercompany debt funding (both capex and opex funding), approximately $40 million in equity, and an additional $200 million in equity financing from MBT AG for the CO Cell Production Facility. The Debtors planned to apply for commercial loans, a German export credit facility, and a loan from the U.S. Department of Energy ("DOE") under the Renewable Energy Loan Program to support the AZ Module Production Facility. An indicative term sheet with Goldman Sachs was signed in 2023, with updated term sheets on July 5, 2024, and closing was expected by the end of July 2024, including an intercreditor agreement with the German export credit loan.

However, by August 2024, due to certain budget overruns and other commercial reasons, the Debtors were unable to close a loan facility with Goldman Sachs or secure other private credit. At the same time, the expected financing of EUR 90 million from the German export credit financing and the equity investment of MBT AG, due to MBT AG's own financial restraints, never materialized. Despite being in the latter stages of the DOE loan application process, due to the inability to obtain private financing and lack of equity, the government loan application was no longer feasible, especially given the long review period and earliest anticipated disbursement in spring of 2025. In total, the Debtors expected to fund the construction and operation of the AZ Module Production Facility with new debt financing, $200 million in customer prepayments (as set forth below), and an equity contribution from MBT AG. Other than some customer prepayments, the Debtors were unable to obtain such funding.

2.      **Operational Difficulties**

In connection with the AZ Module Production Facility, the Debtors also experienced substantial operational setbacks that hindered their ability to ramp up to full production levels and impacted their ability to generate revenue, tax credits, and profitability. Prior to ceasing operations, the AZ Module Production Facility was still in ramp-up status of one out of two lines only, and the AZ Module Production Facility did not achieve 2024 production volume or projected 2025 production volume. As a result, anticipated Section 45X Credits for 2024 and 2025 never materialized. The Debtors only expected to achieve full production levels by mid-2026, but achieving those levels would have required additional significant investments of approximately $80 million (capex, commissioning, and ramp-up costs). Consequently, the ability to generate the tax credits necessary to reach profitability was reduced and significantly delayed.

Initially, the design of the facility's production lines did not meet the intended solar module design, and therefore, the facility was incapable of producing the planned solar modules. This caused an estimated six-month delay in ramping up production, as the Debtors were required to redesign the production lines and install equipment to manufacture the correct solar modules. The delay brought its own cost overages, including redesign and equipment changes, which increased the expected cost to complete the AZ Module Production Facility.

The Debtors obtained most of their equipment and materials for the AZ Module Production Facility from overseas, which inherently presented difficulties, delays, and damaged goods. The Debtors suffered from delays in construction and production due to equipment being damaged during transportation. Furthermore, because the Debtors relied on international suppliers and shipping, the Debtors were required to time orders of raw materials and production so as to operate at maximum efficiency. Without adequate materials and equipment, the Debtors did not realize the anticipated automated production cycle time, which reduced efficiency and caused cost overages. These setbacks prohibited the Debtors from breaking through to maximum production, which magnified their deteriorating financial condition as they were unable to realize the Section 45X Credits or receive customer funds—the Debtors found themselves in a negative feedback loop of intertwined obligations.

3.      **Customer Prepayments and DESRI Default**

To fund, in part, construction and operations, the Debtors entered into certain customer contracts that required the Debtors to meet production requirements in exchange for pre-payments by customers for solar modules, which were expected to generate up to $200 million in advanced payments. MBA and DESRI entered into that certain Master Module Supply Agreement, dated September 27, 2022 (as amended, modified or supplemented, the "DESRI Agreement") pursuant to which MBA received prepayments totaling $35,472,996.12. MBA also entered into that certain Framework Agreement, dated March 21, 2023 (as amended, modified, or supplemented, the "Ingka Agreement") with II Renewable Energy Europe BV, in connection with which MBA received prepayments totaling $67,000,000.00.

On November 14, 2024, DESRI notified the Debtors that, due to alleged breaches under the DESRI Agreement by MBA, DESRI was terminating the DESRI Agreement. Under Swiss law, the DESRI notice of default was a material change that required MBT AG to file an Ad Hoc Notice with the Swiss stock exchange, advising the public of the notice of default. This public Ad Hoc Notice further harmed the Debtors' efforts to secure financing that would permit continued operations and a going-concern sale process. Following the purported termination notice from DESRI, the Debtors dedicated significant time and effort to reinstating the DESRI Agreement. These efforts never led to a full resolution, although DESRI and MBA ultimately agreed to continue to operate under a term sheet with Babacomari (the "2024 Babacomari Order Sheet"). Under the terms required by DESRI, however, the continued fulfillment of such orders led to more losses suffered by MBA. Ultimately, MBA ceased making deliveries to DESRI under the 2024 Babacomari Order Sheet. On June 12, 2025, DESRI purportedly served the Debtors with a formal notice of default and foreclosure asserting that MBA was in default under the 2024 Babacomari Order Sheet and indicating that DESRI would hold a public auction of certain collateral (the "DESRI Collateral") pursuant to Article 9 of the Uniform Commercial Code on July 1, 2025.

4. **European Insolvency Proceedings and Strategic Alternatives**

As a result of the economic pressures facing the Meyer Burger Group, in August 2024, the Meyer Burger Group began exploring strategic alternatives to preserve liquidity and maintain operations. Initially, the efforts focused on a recapitalization transaction with the holders of approximately EUR 361 million of publicly traded bonds issued by MBT Systems GmbH ("MBT Systems"), a subsidiary of MBT AG. Certain holders of such bonds formed the AHG. Throughout November 2024, the Debtors and the Meyer Burger Group continued negotiations with the AHG to secure a bridge loan facility that would allow the Meyer Burger Group and the Debtors to implement an out-of-court restructuring plan and avoid bankruptcy. The Bridge Loan originally was intended to be a temporary funding mechanism to support the Meyer Burger Group, including the Debtors, until a global recapitalization transaction could be put in place. The initial commitment under the Bridge Credit Agreement was $25,614,943.30 (the "Initial Draw"). The proceeds of the Initial Draw were intended to fund daily operations for the Meyer Burger Group and facilitate an out-of-court restructuring process.

Initially, the Debtors assumed that they could stabilize U.S. operations and successfully pursue an overall recapitalization transaction through a deal with DESRI that would restructure the DESRI Agreement. It eventually became evident, however, that a comprehensive deal with DESRI would not be achieved. Despite the increasingly limited prospects of achieving a deal with DESRI, the AHG continued to advance funds under the Bridge Credit Agreement. Ultimately, the AHG and the Meyer Burger Group realized that a recapitalization transaction on the terms originally contemplated was unlikely to be achieved. Accordingly, the Meyer Burger Group and the AHG agreed that the Meyer Burger Group would continue to explore the possibility of a sale of the global enterprise or parts of the global enterprise, an approach the parties believed made sense given the commercial interconnectivity of the Meyer Burger operations.

Despite the support provided by the AHG, market headwinds continued to thwart the Debtors' marketing efforts and the Debtors' liquidity position further eroded. The Meyer Burger Group entities' operations also began to aggressively break down. Partly as a result of the requirements of German law, the AHG was unable to continue funding MBG and MBI. As a result, on May 30, 2025, MBT AG filed for a debt restructuring moratorium in Switzerland. Shortly thereafter, MBG and MBI filed for insolvency proceedings in Germany, with a preliminary insolvency administrator having been appointed for each company. These European restructuring proceedings further complicated Meyer Burger's U.S. plans and, coupled with the current uncertainty in the U.S. solar market and the market volatility regarding tariffs, have all contributed to the events leading up to the Chapter 11 Cases.

## G.    The Chapter 11 Cases

### 1.    First Day Relief

On the Petition Date, the Debtors filed several customary motions designed to facilitate the administration of these Chapter 11 Cases and minimize disruption to the Debtors' operations. A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of Justin D. Pugh, Chief Restructuring Officer, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* [Docket No. 9].

### 2.    DIP Financing

On July 17, 2025, the Bankruptcy Court entered the Final DIP Order authorizing the Debtors to obtain postpetition financing pursuant to section 364 of the Bankruptcy Code, authorizing the use of cash collateral pursuant to section 363 of the Bankruptcy Code, granting adequate protection to the Prepetition Secured Parties pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, granting liens and superpriority claims, and modifying the automatic stay.

The DIP Facility consists of a senior secured priming and superpriority postpetition financing in the form of a delayed-draw term loan facility. The total maximum aggregate original principal amount of the DIP Facility is $23,260,252, consisting of: (i) an interim delayed-draw term loan facility in an aggregate maximum principal amount of $2,500,000 (the "Interim New Money DIP Loans") that became available upon entry of the Interim Order; (ii) a

final delayed-draw term loan facility in an aggregate maximum principal amount of $6,714,885.50 (the "Final New Money DIP Loans") that became available upon entry of the Final DIP Order; and (iii) the Roll-Up DIP Facility.

The Roll-Up DIP Facility provides for the "roll up" and conversion on a cashless dollar-for-dollar basis of Prepetition Secured Obligations held by the DIP Lenders into principal obligations constituting DIP Obligations. Upon entry of the Interim Order, Prepetition Secured Obligations in an aggregate principal amount of $4,830,481.70 were rolled up, together with a 1:1 ratio of additional prepetition debt for each dollar of DIP Loans advanced during the interim period. The aggregate principal amount of the Interim Roll-Up Loans was $7,330,481.70. Upon entry of the Final DIP Order, additional Prepetition Secured Obligations were rolled up in a 1:1 ratio for each dollar of DIP Loans advanced during the final period. The aggregate principal amount of the Final Roll-Up Loans was $6,714,885.50.

On January 27, 2026, the Bankruptcy Court entered the *Order (I) Approving Settlement Agreement by and among the Debtors, the DIP Secured Parties, the Prepetition Secured Parties, the Official Committee of Unsecured Creditors and the Putative WARN Claimants and (II) Modifying the Final DIP Order* (D.I. 431), whereby the DIP Lenders agreed to fund additional New Money DIP Loans in delayed draws (including through the use of funds currently held in escrow by the Debtors which shall be deemed New Money DIP Loans) up to the aggregate amount of $1,200,000.00, which also results in an additional roll-up of $1,200,000.00 of Prepetition Secured Obligations.

The DIP Facility is secured by DIP Liens on substantially all property of the Debtors, now existing or hereafter acquired, including all cash and cash equivalents, money, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, securities and other investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, letters of credit, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, permits, franchise rights, capital stock and other equity interests of subsidiaries, tax and other refunds, claims or causes of action under policies of insurance, proceeds of policies of insurance, commercial tort claims, and rights under section 549 of the Bankruptcy Code. The DIP Liens are first priority senior priming liens, subject only to (i) valid, enforceable, and non-avoidable liens in existence on the Petition Date that are senior in priority to the Prepetition Secured Liens (the "Prepetition Prior Liens") and (ii) the Carve-Out for professional fees and other expenses.

In addition to the DIP Liens, the DIP Secured Parties received superpriority administrative expense status under section 364(c)(1) of the Bankruptcy Code, with priority over all administrative expenses, including those specified in sections 503(b) and 507(b) of the Bankruptcy Code, subject to the Carve-Out. As of the Petition Date, the Debtors owed the Prepetition Secured Parties, pursuant to the Prepetition Loan Documents, an aggregate principal amount of not less than $89,064,440.10, plus all accrued and unpaid interest and fees.

### 3.       Appointment of the Committee

On July 8, 2025, the Office of the United States Trustee for the District of Delaware appointed the Official Committee of Unsecured Creditors which was comprised of the following creditors: Amcor Flexibles Transpac BV, Fura Freight LLC, Shinyang Metal, Schrader Mechanical Inc., and Synergy West. LLC.

### 4.       Claims Process and Bar Date

The Bankruptcy Court entered the Bar Date Order establishing bar dates and related procedures for filing proofs of claim and administrative expense requests. All creditors holding or wishing to assert unsecured or secured, priority or nonpriority Claims against the Debtors, including Claims arising under section 503(b)(9) of the Bankruptcy Code, were required to file a separate, completed, and executed Proof of Claim Form on account of each such Claim by the applicable Bar Date.

### 5.       Sale of Assets to Waaree

The Debtors conducted a sale process and Waaree was the successful bidder for substantially all of the Debtors' assets (other than the DESRI Solar Cells and the Disputed Modules) as specifically described in the Waaree

APA. On September 22, 2025, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets to Waaree free and clear of liens, claims, interests and encumbrances.

Pursuant to the Asset Purchase Agreement dated September 19, 2025, Waaree agreed to purchase the Purchased Assets for an aggregate purchase price consisting of: (a) $18,500,000 in cash (the "Cash Amount"); plus (b) the assumption of the Assumed Liabilities; plus (c) any Inventory Surplus Amount; less (d) any Inventory Deficit Amount. The Purchased Assets include: (i) all right, title, and interest in the Leased Real Property at 1685 S. Litchfield Road, Goodyear, Arizona; (ii) approximately 16,424,760 half cells (103 MW equivalent) of M10 type (excluding DESRI Cells); (iii) all fixtures, furniture, furnishings, equipment, leasehold improvements, and other tangible personal property located at the Leased Real Property, including solar panel raw materials and supply raw materials; (iv) certain Purchased Contracts, including the Arizona Manufacturing Lease, the Broadrange Logistics Merchandise Warehouse Agreement, and various service agreements; (v) certain books, records, and files; (vi) security deposits; and (vii) transferable Company Permits.

### 6.    Sale of DESRI Solar Cells

On September 5, 2025, the Bankruptcy Court entered an order authorizing the sale of the DESRI Solar Cells (approximately 32,592,610 photovoltaic half cells totaling approximately 127.370320 MWs) free and clear of liens, claims, interests and encumbrances to Babacomari Solar North, LLC.

The DESRI Solar Cells were subject to a prepetition security interest asserted by Babacomari Solar North, LLC and its affiliate DESRI Equipment Financing Borrower, L.L.C. (jointly, the "DESRI Entities"). Pursuant to the Bidding Procedures Order, the DESRI Entities were entitled to credit bid for the DESRI Solar Cells only up to the amount of $15,028,013.05, subject in all respects to any offset, setoff, and/or recoupment rights of the Debtors and their estates. 130 Babacomari Solar North, LLC submitted the successful credit bid in the amount of $10,189,625.60, plus the release of certain warranty claims.

Upon the closing of the sale, DESRI's secured claim was reduced from the credit bid cap of $15,028,013.05 to the amount of $4,838,387.45, subject in all respects to any offset, setoff, and/or recoupment rights of the Debtors and their estates.

### 7.    WARN Litigation

At the beginning of May 2025, the Debtors employed more than 400 employees at the AZ Module Production Facility. Discussions on a potential deal that would have resulted in the recapitalization and restructuring of the global Meyer Burger enterprise were abruptly terminated when a potential investor, and other interested parties that had expressed an interest in investing in the global Meyer Burger enterprise, failed to commit to a binding transaction. Moreover, German law restrictions on the ability to advance funds to the Debtors' German affiliates, one of which (MBI) was the sole supplier of the Debtors' solar cells, ultimately led to MBI and MBG commencing preliminary liquidation proceedings in Germany. These factors, coupled with the Debtors' manufacturing challenges and macro-economic headwinds, led to the Debtors having to make the difficult decision to lay off their entire workforce and cease all production at the AZ Module Production Facility by no later than May 31, 2025.

Following this layoff, certain of the Debtors' former employees filed a class-action lawsuit styled *Gilbert v. Meyer Burger (Americas) Ltd.*, No. 2:25-cv-01898-PHX-SPL (D. Ariz) (the "WARN Litigation"), alleging that the company violated the Worker Adjustment Retraining and Notification Act by failing to (i) give them a sixty-day advance written notice and (ii) pay them sixty-days of backpay and benefits.

Under the Committee Settlement Agreement described below, the parties agreed to confer and use reasonable, good-faith efforts to liquidate and/or otherwise resolve the Alleged WARN Claim (as defined therein) prior to or at the Confirmation Hearing (as defined therein). If the parties are unable to reach agreement on the liquidation and/or other disposition of the Alleged WARN Claim, any party may, on no less than twenty-one (21) days' notice prior to the Confirmation Hearing, file a motion seeking estimation of the Alleged WARN Claim for purposes of confirmation. The Putative WARN Claimants have covenanted to support confirmation of an Acceptable Plan (as defined therein) and to refrain from objecting to confirmation on any grounds, including any objection

premised on the timing of payment of any portion of the Alleged WARN Claim that may be entitled to priority under the Bankruptcy Code. The Putative WARN Claimants' recoveries on account of the Alleged WARN Claim shall be limited exclusively to distributions from funds allocated to unsecured creditors under the Committee Settlement Agreement and an Acceptable Plan.

**8.      The Committee Settlement Agreement**

The Debtors, the Committee and its members, the DIP Secured Parties, the Prepetition Secured Parties and the Putative WARN Claimants (collectively, the "Committee Settlement Agreement Parties,") negotiated the Committee Settlement Agreement, dated January 7, 2026, which provides for, among other things: (a) funding of distributions to unsecured creditors from Liquidation Trust Assets; (b) payment in full of the New Money DIP Obligations from Liquidation Trust Assets; (c) distributions on account of the Roll-Up DIP Obligations from recoveries as and to the extent provided in the Committee Settlement Agreement; (d) sharing of recoveries between secured parties and unsecured creditors; and (e) classification of Intercompany Claims as Allowed general unsecured claims that will not be subordinated.

**ARTICLE III**
**CONSOLIDATION OF THE DEBTORS; CLASSIFICATION AND TREATMENT OF CLAIMS AND**
**INTERESTS**

**A.      Consolidation of the Debtors**

The Debtors' Estates will be consolidated for administrative purposes related to this Plan, including for purposes of (1) implementing this Plan, (2) voting, (3) assessing whether the standards for Confirmation have been met and (4) calculating and making Distributions under this Plan.

On the Effective Date, for administrative purposes related to this Plan, (1) all of the Debtors' assets and liabilities will be merged; (2) all guarantees or responsibility of one Debtor for the obligations of any other Debtor will be eliminated, and all guarantees or responsibility executed by multiple Debtors for the obligations of any other Entity will be consolidated into a single obligation, so that any Claim against any Debtor and any guarantee or responsibility thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be one obligation of the Debtors; (3) each and every Claim Filed or to be Filed in the Chapter 11 Case of any Debtor will be Filed against, and will be a single obligation of, the Debtors; and (4) except as set forth in the Plan, Interests of one Debtor in another Debtor will be cancelled. This consolidation will not affect (1) the vesting of the Debtors' assets in the Liquidation Trust; (2) the right to distributions from any Insurance Policies or proceeds of such policies; (3) any Liens granted or arising at any time prior to the Effective Date or the priority of those Liens; or (4) the rights of the Debtors or the Liquidation Trustee to contest setoff or recoupment rights alleged by creditors on the grounds of lack of mutuality under section 553 of the Bankruptcy Code and other applicable law.

**B.      Classification and Treatment of Claims and Interests**

All Claims and Interests, except for those Claims set forth in Section III.C below, are classified for voting and Distribution pursuant to this Plan as set forth below. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims are not classified herein. A Claim or Interest is classified in a particular Class only to the extent that such Claim or Interest fits within the description of that Class and is classified in other Classes to the extent that any remainder of such Claim or Interest qualifies within the description of such other Classes. A Holder of a Claim that may be asserted against more than one of the Debtors shall be entitled to a single Distribution as if such Holder had a single Claim against the Debtors.

On October 8, 2025, the Debtors filed the *Motion of Debtors for Entry of an Order (I) Establishing Bar Dates and Related Procedures for Filing (A) Proofs of Claim (Including for Administrative Expense Claims Arising Under Section 503(b)(9) of the Bankruptcy Code) and (B) Administrative Expense Requests and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 303]. On October 17, 2025, the Bankruptcy Court entered an order [Docket No. 322] establishing November 21, 2025 at 5:00 p.m. (prevailing Eastern Time) as the deadline by which any person or entity must assert an Administrative Expense Claim arising from and after the Petition Date through and including September 30, 2025. As of the date hereof, approximately four (4) requests for administrative expense claims in the

total amount of approximately $686,751.53 have been filed in the Chapter 11 Cases. The Debtors have not yet analyzed or reconciled such claims.

## C.    Unclassified Claims

### 1.    Payment of Administrative Expense Claims

#### a.    Administrative Expense Claims in General

Except as specified in this Section III.C.1, and subject to the Bar Date Order, unless otherwise agreed by the Holder of an Administrative Expense Claim and the applicable Debtor or the Liquidation Trustee, as applicable, or unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Expense Claim will receive, in full satisfaction of its Administrative Expense Claim, Cash equal to the full unpaid amount of such Allowed Administrative Expense Claim, which payments shall be made from the Liquidation Trust Assets at the Liquidation Trustee's option, (i) in the ordinary course of business or (ii) on the latest to occur of (A) the Effective Date (or as soon as reasonably practicable thereafter), (B) the date such Claim becomes an Allowed Administrative Expense Claim (or as soon as reasonably practicable thereafter) and (C) such other date as may be agreed upon by the Liquidation Trustee and the Holder of such Claim.

#### b.    Statutory Fees and U.S. Trustee Reporting Obligations

All Statutory Fees due and payable for each Debtor's Chapter 11 Case shall be paid by the Debtors on the Effective Date.  After the Effective Date, the Debtors and the Liquidation Trust shall be jointly and severally liable to pay any and all Statutory Fees when due and payable.  The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR.  After the Effective Date, the Debtors and the Liquidation Trustee, on behalf of the Liquidation Trust, shall file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due.  Notwithstanding anything called for in the Plan to the contrary, the Debtors and the Liquidation Trust shall remain obligated to pay Statutory Fees to the Office of the U.S. Trustee and make such reports until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  The U.S. Trustee shall not be required to file any Administrative Expense Claims in the cases and shall not be treated as providing any release under the Plan.  The obligations in this paragraph shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code is entered or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

#### c.    Professional Compensation

##### i.    Final Fee Applications and Payment of Professional Fee Claims

To the extent required by a Final Order of the Court approving a Professional's retention, all final requests for payment of Professional Fee Claims incurred during the period from the Petition Date through the Effective Date shall be Filed no later than 45 days after the Effective Date.  All such final requests will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior orders of the Bankruptcy Court, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Escrow Account up to the full Allowed amount.  Professional Fee Claims not subject to approval by separate Court order will be paid from the Professional Fee Escrow Account in accordance with any Final Order approving the retention of such Professional.

Subject to the terms of the Committee Settlement Agreement, to the extent that funds held in the Professional Fee Escrow Account are insufficient to satisfy the amount of Professional Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Expense Claim for any such deficiency, which shall be satisfied in accordance with Section III.C.1.a of this Plan.

### ii.    Professional Fee Escrow Account

As soon as practicable after Confirmation and not later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the Professional Fee Escrow Amount. The Professional Fee Escrow Account shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtors' Estates. The amount of Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow Account as set forth in this Section III.C.1.c of the Plan.

When all Professional Fee Claims have been paid in full as set forth in this Section III.C.1.c of the Plan, any remaining amount in the Professional Fee Escrow Account shall become Liquidation Trust Assets and be distributed to Holders of Allowed Claims in accordance with the terms of the Plan, the Committee Settlement Agreement, and the Liquidation Trust Agreement.

### d.    Post-Effective Date Professional Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code  (or any order entered by the Bankruptcy Court governing professional fees and expenses) shall terminate, and the Debtors or the Liquidation Trust, as applicable, may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court, subject to the terms of the Liquidation Trust Agreement.

### e.    Bar Date for Administrative Expense Claims.

Holders of Administrative Expense Claims that were required to File and serve a request for payment of such Administrative Expense Claims under the Bar Date Order and that have not or do not File and serve such a request by the applicable Bar Date or as otherwise set forth in this Plan, are forever barred from asserting such Administrative Expense Claims against the Debtors, the Liquidation Trust or their respective property.

## 2.    Payment of Priority Tax Claims

### a.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtors or the Liquidation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Liquidation Trustee, as applicable, in full satisfaction of its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, on account of and in full and complete settlement, satisfaction and release of such Claim, (i) Cash from the Liquidation Trust Assets in an amount equal to the amount of such Allowed Priority Tax Claim or (ii) Cash from the Liquidation Trust Assets in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### b.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary in Article III of this Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtors, the Liquidation Trust or their respective property.

## D.    Classification of Claims and Interests

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Interests are classified for voting and Distribution pursuant to this Plan, as set forth herein. A Claim or Interest shall be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed

classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such other Class.  Except as otherwise specifically provided for herein, the Confirmation Order or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under the Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

E.    **Treatment of Claims and Interests**

    1.    **Other Secured Claims (Class 1)**

        a.    ***Classification.***  Class 1 consists of all Other Secured Claims.

        b.    ***Treatment.***  Unless otherwise agreed by any Holder of an Allowed Other Secured Claim and the Debtors or the Liquidation Trustee (as applicable), on the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) the date on which such Other Secured Claim becomes an Allowed Claim, each Holder of an Allowed Other Secured Claim shall receive the following treatment at the option of the Liquidation Trustee: (A) payment in full in Cash from the Liquidation Trust Assets; (B) delivery of the collateral securing such Allowed Other Secured Claim and payment of any interest thereon required to be paid under section 506(b) of the Bankruptcy Code; or (C) such other recovery as is necessary to render such Claim Unimpaired.

        c.    ***Voting.***  Claims in Class 1 are Unimpaired.  Each Holder of an Allowed Claim in Class 1 is conclusively presumed to have accepted this Plan and, therefore, is not entitled to vote on this Plan.

    2.    **Non-WARN Priority Claims (Class 2A)**

        a.    ***Classification.***  Class 2A consists of all Non-WARN Priority Claims.

        b.    ***Treatment.***  Unless otherwise agreed by any Holder of an Allowed Priority Claim and the Debtors or the Liquidation Trustee (as applicable), on the later of (i) the Effective Date or as soon as reasonably practicable thereafter and (ii) the date on which a Priority Claim becomes an Allowed Claim, each Holder of an Allowed Priority Claim will receive on account of and in full and complete settlement and release of such Claim, a Cash Distribution from the Liquidation Trust Assets in the amount of such Allowed Priority Claim.

        c.    ***Voting.***  Claims in Class 2A are Unimpaired.  Each Holder of an Allowed Claim in Class 2A is conclusively presumed to have accepted this Plan and is, therefore, not entitled to vote on this Plan.

    3.    **WARN Priority Claims (Class 2B)**

        a.    ***Classification.***  Class 2B consists of all WARN Priority Claims.

        b.    ***Treatment.***  Consistent with the Committee Settlement Agreement, each Holder of an Allowed Class 2B Claim shall receive a Cash Distribution solely from Liquidation Trust Assets allocated to unsecured creditors under the Committee Settlement Agreement, exclusively from the Earmarked Funds and paragraphs 4(e)(B)(a)(ii), 4(e)(B)(b)(ii), and 4(e)(C)(a)(ii) and (b) of the Settlement Agreement, net of Liquidation Trust Expenses and all senior claims (including Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Claims). Distributions shall be made Pro Rata in accordance with the Bankruptcy Code's priority scheme when, and in such amounts, as the Liquidation Trustee determines to make distributions in light of the circumstances then

prevailing. For the avoidance of doubt, no portion of any WARN Priority Claim shall be satisfied from collateral securing any secured creditor or from funds payable on account of Allowed Administrative Expenses.

    **c.**    ***Voting.*** Claims in Class 2B are Impaired.  Each Holder of an Allowed Claim in Class 2B is, therefore, entitled to vote on this Plan.

**4.**    **Prepetition and DIP Lender Secured Claims (Class 3)**

    **a.**    ***Classification.*** Class 3 consists of all Prepetition Secured Lender Claims and DIP Claims.

    **b.**    ***Treatment.*** Consistent with the Committee Settlement Agreement, each Holder of an Allowed Class 3 Claim shall receive distributions from Liquidation Trust Assets in accordance with the Committee Settlement Agreement's waterfall, including, without limitation, (A) first, payment in full of the New Money DIP Obligations; (B) second, distributions on account of the Roll-Up DIP Obligations from recoveries as and to the extent provided in the Committee Settlement Agreement, with agreed sharing to unsecured creditors from specified sources as set forth in the Committee Settlement Agreement; and (C) thereafter, distributions to the Allowed AHG Secured Claims as provided in the Committee Settlement Agreement, with agreed sharing to unsecured creditors from specified sources as set forth in the Committee Settlement Agreement.

For the avoidance of doubt, from and after the Effective Date, the Liens securing the Allowed Class 3 Claims shall be first-priority perfected liens and security interests on all Liquidation Trust Assets pursuant to the Final DIP Order and Committee Settlement Agreement (including the Priority of Distributions), which shall be effective, unavoidable, and automatically and properly perfected upon entry of the Confirmation Order, without the necessity of the execution, recordation or filing of any document or filing or any other action of any kind by the Debtors or any of the Secured Parties, and the DIP Claims and Prepetition Secured Lender Claims are Allowed Claims pursuant to the Final DIP Order and Committee Settlement Agreement.

Additionally, the New Money DIP Loans contemplated under the Committee Settlement Agreement shall remain in existence on the same terms as set forth in the Committee Settlement Agreement and Final DIP Order and shall constitute and be approved as exit financing pursuant to the Confirmation Order.

    **c.**    ***Voting.*** Claims in Class 3 are Impaired.  Each Holder of an Allowed Claim in Class 3 is, therefore, entitled to vote on this Plan.

**5.**    **Prepetition Secured Lender Deficiency Claims (Class 4A)**

    **a.**    ***Classification.*** Class 4A consists of all Prepetition Secured Lender Deficiency Claims.

    **b.**    ***Treatment.*** Subject to the Committee Settlement Agreement (including the Priority of Distributions and any gating thresholds for unsecured distributions), each Holder of an Allowed Class 4A Claim shall receive its Pro Rata share of distributions from Liquidation Trust Assets as and when such distributions are made; provided, that distribution sharing between Class 4A and other General Unsecured Claims shall be as set forth in the Committee Settlement Agreement.

    **c.**    ***Voting.*** Claims in Class 4A are Impaired.  Each Holder of an Allowed Claim in Class 4A is, therefore, entitled to vote on this Plan.

6. **General Unsecured Claims Other Than Prepetition Secured Lender Deficiency Claims (Class 4B)**

   a. ***Classification.*** Class 4B consists of all General Unsecured Claims other than Prepetition Secured Lender Deficiency Claims.

   b. ***Treatment.*** Each Holder of an Allowed Class 4B Claim shall receive its Pro Rata share of distributions from the Liquidation Trust Assets available for unsecured creditors, after payment of Liquidation Trust Expenses and all senior claims, including Allowed Administrative Expense, Allowed Priority Tax Claims, Allowed Priority Claims and Allowed WARN Priority Claims. Distributions to Holders of Allowed Class 4B Claims shall be made at such time as the Liquidation Trustee determines to make distributions in light of the circumstances then prevailing.

   c. ***Voting.*** Claims in Class 4B are Impaired. Each Holder of an Allowed Claim in Class 4B is, therefore, entitled to vote on this Plan.

7. **Interests in the Debtors (Class 5)**

   a. ***Classification.*** Class 5 consists of all Interests in the Debtors.

   b. ***Treatment.*** On the Effective Date, Interests in the Debtors will be canceled, and Holders of Class 5 Interests will not receive any Distribution pursuant to this Plan.

   c. ***Voting.*** Each Holder of a Class 5 Interest will be deemed to have rejected this Plan and, therefore, is not entitled to vote on this Plan[; *provided, however,* that, upon the Effective Date, the Liquidating Trustee shall be deemed to hold the New MBHC Equity Interest; *provided, further*, that the Liquidating Trustee shall not be entitled to receive any Distribution on account of such New MBHC Equity Interest].

**F.    Reservation of Rights Regarding Claims**

Except as otherwise provided in this Plan or in other Final Orders of the Bankruptcy Court, nothing shall affect the Debtors' or the Liquidation Trustee's respective rights and defenses, whether legal or equitable, with respect to any Claim, including, without limitation, all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

**G.    Postpetition Interest on Claims**

Except as required by applicable bankruptcy law, postpetition interest shall not accrue or be payable on account of any Claim.

**H.    Insurance**

Notwithstanding anything to the contrary herein, if any Allowed Claim is covered by an Insurance Policy, such Claim shall first be paid from proceeds of such Insurance Policy, with the balance, if any, treated in accordance with the provisions of this Plan governing the Class applicable to such Claim.

**I.    Class Without Voting Claim Holders**

If Holders of Claims in a particular Impaired Class of Claims are entitled to vote to accept or reject this Plan, but no Holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

# ARTICLE IV
## CONFIRMATION AND VOTING PROCEDURES

### A.    Confirmation Procedures

The Disclosure Statement Order, among other things, will conditionally approve the Combined Plan and Disclosure Statement for solicitation purposes only and authorize the Debtors to solicit votes to accept or reject the Plan.  The Combined Hearing has been scheduled for **April 17, 2026 at 1:00 p.m. (prevailing Eastern Time)** at the Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom #1, Wilmington, Delaware 19801 to consider (a) final approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (b) confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.  The Combined Hearing may be adjourned from time to time by the Debtors and/or the Committee without further notice, except for an announcement of the adjourned date made at the Combined Hearing or by filing a notice with the Bankruptcy Court.

### B.    Procedure for Objections

Any objection to (a) conditional approval of the Disclosure Statement as providing adequate information pursuant to section 1125 of the Bankruptcy Code or (b) final approval of the Disclosure Statement and confirmation of the Plan must be made in writing and filed with the Bankruptcy Court and served on (i) counsel to the Debtors, Richards, Layton & Finger P.A., One Rodney Square, 9210 North king Street, Wilmington, DE 19801, Attn: Paul N. Heath (heath@rlf.com), Brendan J. Schlauch (schlauch@rlf.com), Jason M. Madron (madron@rlf.com), Zachary J. Javorsky (javorsky@rlf.com), and Nicholas A. Franchi (franchi@rlf.com); (ii) counsel to the Creditors' Committee, Fox Rothschild LLP, 919 N. Market Street, Ste. 300, Wilmington, DE 19899, Attn: Seth A. Niederman (sniederman@foxrothschild.com) and Stephanie Slater-Ward (sward@foxrothschild.com), and Fox Rothschild LLP, Two Commerce Square, 2001 Market Street, Suite 1700, 19103 Attn: Jesse M. Harris (jesseharris@foxrothschild.com); (iii) Office of the United States Trustee for the District of Delaware, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: Joseph McMahon (Joseph.McMahon@usdoj.gov) (collectively, the "Objection Recipients"); in each case, by no later than (a) February 25, 2026 at 4:00 p.m. (prevailing Eastern Time) in connection with conditional approval of the Disclosure Statement and (b) April 6, 2026 at 4:00 p.m. (prevailing Eastern Time) in connection with final approval of the Disclosure Statement and confirmation of the Plan. Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Combined Hearing.

### C.    Requirements for Confirmation

The Bankruptcy Court will confirm the Plan only if it meets all of the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, the Plan (a) must be accepted by all Impaired Classes of Claims or Interests or, if rejected by an Impaired Class, the Plan must not "discriminate unfairly" against, and be "fair and equitable" with respect to, such Class; and (b) must be feasible.  The Bankruptcy Court must also find that: (i) the Plan has classified Claims and Interests in a permissible manner; (ii) the Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith.

### D.    Classification of Claims and Interests

Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those Claims which, pursuant to section 1123(a)(1) of the Bankruptcy Code, need not be classified).  The Debtors also are required, under section 1122 of the Bankruptcy Code, to classify Claims and Interests into Classes that contain Claims or Interests that are substantially similar to the other Claims or Interests in such Class.

The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest. The Debtors believe that the Plan complies with such standard.  If the Bankruptcy Court finds otherwise, however, it

could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

The Debtors believe that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law.  It is possible that a Holder of a Claim or Interest may challenge the Debtors' classification of Claims or Interests and that the Bankruptcy Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Debtors intend, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its Confirmation.  Any such reclassification could adversely affect Holders of Claims by changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**E.**    **Impaired Claims or Interests**

Pursuant to the provisions of the Bankruptcy Code, only classes of claims or interests that are "impaired" (as defined in section 1124 of the Bankruptcy Code) under a plan may vote to accept or reject such plan.  Generally, a claim or interest is impaired under a plan if the holder's legal, equitable, or contractual rights are altered under such plan.  In addition, if the holders of claims or interests in an impaired class do not receive or retain any property under a plan on account of such claims or interests, such impaired class is deemed to have rejected such plan under section 1126(g) of the Bankruptcy Code and, therefore, such holders are not entitled to vote on such plan.

Under the Plan, Holders of Claims in Classes 2B, 3, 4A, and 4B are Impaired and are entitled to vote on the Plan.  Under the Plan, Holders of Claims or Interests in Class 5 are Impaired and will not receive or retain any property under the Plan on account of such Claims or Interests and, therefore, are not entitled to vote on the Plan and are deemed to reject the Plan.  Under the Plan, Holders of Claims in Classes 1A and 3 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS, AS OF THE VOTING RECORD DATE, IN CLASSES 2B, 3, 4A, AND 4B.

IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE.  PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY.  YOU MAY ALSO SUBMIT A BALLOT THROUGH THE NOTICE, CLAIMS, AND SOLICITATION AGENT'S ONLINE ELECTRONIC BALLOT UPLOAD PORTAL LOCATED AT HTTPS://RESTRUCTURING.RA.KROLL.COM/MEYERBURGER/.  IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE NOTICE, CLAIMS, AND SOLICITATION AGENT AT:

Meyer Burger Ballot Processing Center
c/o Kroll Restructuring Administration LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232
Email: meyerburgerballots@ra.kroll.com (with "Meyer Burger Solicitation Inquiry" in the subject line)
Telephone: (877) 306-1618 (U.S./Canada, toll-free) / +1 (646) 440-4826 (International, toll)

THE NOTICE, CLAIMS, AND SOLICITATION AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.  IF YOU BELIEVE YOU REQUIRE LEGAL ADVICE, YOU SHOULD CONSULT WITH YOUR ATTORNEY. NOTICE, CLAIMS, AND SOLICITATION AGENT IS AUTHORIZED TO

DESTROY ALL PAPER/HARDCOPY RECORDS RELATED TO THIS MATTER TWO (2) YEARS AFTER THE EFFECTIVE DATE HAS OCCURRED.

**F.        Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code**

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any Class of Claims or Interests that votes or is deemed to reject the Plan, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

The Debtors believe that the requirements of section 1129(b) of the Bankruptcy Code are satisfied.  The Bankruptcy Code does not provide a standard for determining when "unfair discrimination" exists; courts typically examine the facts and circumstances of each particular case to determine whether unfair discrimination exists.  At a minimum, however, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under a proposed plan without sufficient justifications for doing so.  The Debtors believe that, under the Plan, all Impaired Classes of Claims or Interests are treated in a manner that is consistent with the treatment of other Classes of Claims or Interests that are similarly situated, if any, except where there is sufficient justification for different treatment.  Accordingly, the Debtors believe that the Plan does not discriminate unfairly as to any Impaired Class of Claims or Interests.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable."  To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors and equity holders, as follows:

**1.        Secured Creditors.**  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value at least equal to the amount of its allowed secured claim as of the Effective Date, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

**2.        Unsecured Creditors.**  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value as of the Effective Date equal to the amount of its allowed claim, or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan on account of such junior claim or interest.

**3.        Interests.**  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the Allowed amount of any fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of such interest, or (ii) the holder of any interest that is junior to such non-accepting class will not receive or retain any property under the plan on account of such junior interest.

The Debtors believe that the distributions provided under the Plan satisfy the absolute priority rule, where required.

**G.        Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors

(unless such liquidation or reorganization is proposed in the Plan). For purposes of this test, the Debtors have analyzed the ability of the Debtors and the Liquidation Trust to meet their obligations under the Plan. Based on the Debtors' analysis, the Debtors and the Liquidation Trust will have sufficient assets to accomplish their tasks under the Plan. Therefore, the Debtors believe that the transactions to be effectuated pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**H.      Best Interests Test and Liquidation Analysis**

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 case was converted to a case under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan. If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

Because the Plan contemplates the liquidation of the Debtors' remaining assets (following the sale of substantially all of the Debtors' assets), the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the transactions contemplated by the Plan.

The Debtors, with the assistance of their advisors, have prepared a liquidation analysis that summarizes the Debtors' best estimate of recoveries by holders of Claims if the Chapter 11 Cases were converted to cases under chapter 7 (the "Liquidation Analysis"), which is attached hereto as Exhibit A.

As detailed in the Liquidation Analysis, the Debtors believe that in a chapter 7 liquidation, there would be additional costs and expenses that the Estates would incur as a result of liquidation of the Estates in a chapter 7 case, which costs and expenses would not be incurred in implementing the Plan and administering the Liquidation Trust. Further, a chapter 7 trustee may not have the necessary funding to cover these additional costs and expenses since, absent the consent of the Secured Parties, the Post-Effective Date Debtors would not have access to the Secured Parties' cash collateral. The Secured Parties have, however, consented to the use of their cash collateral by the Liquidation Trust in accordance with the Plan.

The costs of liquidation under chapter 7 of the Bankruptcy Code would also include the compensation of a trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amounts may exceed the amount of expenses that would be incurred in implementing the Plan and winding up the affairs of the Debtors. Conversion also would likely delay the liquidation process and ultimate distribution of the Debtors' assets and would also mean the establishment of a new Claims bar date, which could result in new Claims being asserted against the Debtors, thereby diluting the recoveries of, among others, Holders of Allowed Unsecured Claims. The Estates would also be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as any super priority administrative claim arising under the Final DIP Order and the compensation for professionals) that are allowed in the Debtors' chapter 7 cases before general unsecured creditors.

Based upon the Liquidation Analysis, the Debtors believe that creditors will receive at least as much or more under the Plan than they would receive if the Chapter 11 Cases were converted to chapter 7 cases.

## ARTICLE V
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    **Liquidation Trust**

1.    **Liquidation Trust Generally**

On or prior to the Effective Date, the Liquidation Trust shall be established in accordance with the Liquidation Trust Agreement for the purpose of liquidating the Liquidation Trust Assets, reconciling Claims, and making all Distributions to Holders of Allowed Claims in accordance with the terms of this Plan and the Liquidation Trust Agreement.

Subject to and to the extent set forth in this Plan, the Confirmation Order, the Liquidation Trust Agreement or any other order of the Bankruptcy Court entered in connection therewith, the Liquidation Trust shall be empowered to: (a) perform all actions and execute all agreements, instruments and other documents necessary to effectuate the purpose of the Liquidation Trust; (b) establish, maintain and administer Trust Accounts, which shall be segregated to the extent appropriate in accordance with this Plan; (c) accept, preserve, receive, collect, manage, invest, sell, liquidate, transfer, supervise, prosecute, settle and protect, as applicable, the Liquidation Trust Assets (directly or through its professionals), in accordance with this Plan; (d) review, reconcile, settle or object to Claims that are Disputed Claims; (e) pursue the Retained Causes of Action as set forth in Section V.D of the Plan; (f) calculate and make Distributions of the proceeds of the Liquidation Trust Assets to Holders of Allowed Claims; (g) retain, compensate and employ professionals to represent the Liquidation Trust; (h) prepare and file appropriate Tax returns and other reports on behalf of the Liquidation Trust and pay Taxes or other obligations owed by the Liquidation Trust; (i) exercise such other powers as may be vested in the Liquidation Trust under the Liquidation Trust Agreement and this Plan, or as are deemed by the Liquidation Trustee to be necessary and proper to implement the provisions of the Liquidation Trust Agreement and effectuate the purpose of the Liquidation Trust; and (j) dissolve the Liquidation Trust in accordance with the terms of the Liquidation Trust Agreement.

Notwithstanding anything to the contrary in this Section V.A, the Liquidation Trust's primary purpose is liquidating the Liquidation Trust Assets, with no objective to continue or engage in the conduct of a trade or business except to the extent reasonably necessary to, and consistent with, the Liquidation Trust's liquidating purpose and reasonably necessary to conserve and protect the Liquidation Trust Assets and provide for the orderly liquidation thereof.

2.    **Funding of and Transfer of Assets Into the Liquidation Trust**

Except as otherwise provided in this Plan or the Confirmation Order, on the Effective Date, the Debtors shall transfer the Liquidation Trust Assets to the Liquidation Trust, and all such assets shall vest in the Liquidation Trust on such date, to be administered by the Liquidation Trustee in accordance with this Plan and the Liquidation Trust Agreement.  The Liquidation Trust Assets shall be transferred to the Liquidation Trust subject to all Liens of the Secured Parties under the Prepetition Credit Agreement, DIP Credit Agreement, Final DIP Order, the Committee Settlement Agreement, and/or any other related loan documents of the Secured Parties.

The Liquidation Trustee shall have the authority to create additional sub-accounts in Trust Accounts and sub-trusts within the Liquidation Trust, which may have a separate legal existence, but which shall be considered sub-accounts or sub-trusts of the Liquidation Trust.

The act of transferring the Liquidation Trust Assets, as authorized by this Plan, shall not be construed to destroy, or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidation Trust as if the asset or right was still held by the applicable Debtor.

3.    **Liquidation Trustee**

Except as otherwise provided in this Plan, the Liquidation Trustee appointed by the AHG (subject to the Committee's consultation rights) (a) shall be the successor to and representative of the Estate of each of the Debtors

within the meaning of section 1123(b)(3)(B) of the Bankruptcy Code, and (b) shall be the sole representative of, and shall act for, the Debtors, and shall assume any such outstanding responsibility of the Debtors under the Plan. The powers, rights and responsibilities of the Liquidation Trustee shall be specified in the Liquidation Trust Agreement and shall include the authority and responsibility to fulfill (a) the items identified in Section VIII.A.1 above and (b) the Liquidation Trustee Functions set forth in Section V.A.5 below. Other rights and duties of the Liquidation Trustee and the Liquidation Trust Beneficiaries shall be as set forth in the Liquidation Trust Agreement.

### 4. Liquidation Trust Oversight Committee

The Liquidation Trust Oversight Committee (the "Oversight Committee") shall be established to review and monitor the actions of the Liquidation Trust as set forth in the Liquidation Trust Agreement; provided, however, that the Committee and the AHG may, mutually agree that there will be no Oversight Committee appointed. The Oversight Committee initially shall be comprised of up to two members. The initial members of the Oversight Committee shall be designated prior to the Combined Hearing and shall be identified in the Liquidation Trust Agreement (each an "Initial Member" and collectively the "Initial Members"). Each of the Committee and the AHG may designate one Initial Member of the Oversight Committee. The Oversight Committee shall have standing to be heard on all matters brought before the Bankruptcy Court after the Effective Date with respect to the Debtors or the Liquidation Trust. Except as set forth in the Liquidation Trust Agreement, the Oversight Committee shall not be entitled to reimbursement from the Debtors or the Liquidation Trust for any fees or expenses incurred in conducting its duties hereunder.

### 5. Liquidation Trustee Functions

On and after the Effective Date, the Liquidation Trustee and/or the Liquidation Trust, as applicable, shall carry out the necessary Liquidation Trustee Functions and may take such actions without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules, other than any restrictions expressly imposed by the Plan, the Confirmation Order or the Liquidation Trust Agreement.

The Liquidation Trustee Functions shall include any and all powers and authority to: (a) effectuate the Plan, including the prosecution and any other disposition of all litigation related to any appeals in respect to the approval and/or implementation of the Plan; (b) wind up the affairs of the Debtors, if and to the extent necessary, including taking any steps to terminate the corporate or organizational existence of the Debtors; (c) take any actions necessary to (i) resolve all matters related to the Liquidation Trust Assets and (ii) vest such assets in the Liquidation Trust; (d) pay all Allowed Claims; (e) pay the Liquidation Trust Expenses; (f) prepare and file appropriate Tax returns and other reports on behalf of the Debtors and pay Taxes or other obligations owed by the Debtors (including, without limitation, any Allowed Administrative Expense Claims and Allowed Priority Tax Claims asserted by taxing authorities), and, in the Liquidation Trustee's discretion, request an expedited determination of any unpaid tax liability of a Debtor pursuant to section 505(b) of the Bankruptcy Code; (h) file, prosecute, settle and/or dispose of any and all objections to asserted Claims; (i) take such actions as are necessary or appropriate to close any of the Debtors' Chapter 11 Cases; (j) retain, compensate and employ professionals to represent the Liquidation Trust or the Liquidation Trustee, as applicable; and (k) take any other actions not inconsistent with the provisions hereof that the Liquidation Trustee deems reasonably necessary or desirable in connection with the foregoing functions.

### 6. Liquidation Trust Agreement

Prior to the Effective Date, the Debtors and the Liquidation Trustee shall execute and file the Liquidation Trust Agreement.

The Liquidation Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidation Trustee and/or other parties. Any such indemnification shall be the sole responsibility of the Liquidation Trust and payable solely from the Liquidation Trust Assets.

7.      **Fees and Expenses of the Liquidation Trust**

From and after the Effective Date, Liquidation Trust Expenses shall be paid from the Liquidation Trust Assets in the ordinary course of business, in accordance with the Plan and the Liquidation Trust Agreement. Without any further notice to any party or action, order or approval of the Bankruptcy Court, the Liquidation Trustee, on behalf of the Liquidation Trust, may employ and pay in the ordinary course of business, any professional (including professionals previously employed by the Debtors) for services rendered or expenses incurred on and after the Effective Date that, in the discretion of the Liquidation Trustee, are necessary to assist the Liquidation Trustee in the performance of the Liquidation Trustee's duties under the Plan and the Liquidation Trust Agreement, subject to any limitations and procedures established by the Liquidation Trust Agreement.

8.      **Indemnification**

The Liquidation Trust shall indemnify the Liquidation Trust Indemnified Parties for, and shall hold them harmless against, any loss, liability, damage, judgment, fine, penalty, claim, demand, settlement, cost or expense (including the reasonable fees and expenses of their respective professionals) incurred without fraud, gross negligence or willful misconduct on the part of the Liquidation Trust Indemnified Parties (which fraud, gross negligence or willful misconduct, if any, must be determined by a Final Order of a court of competent jurisdiction) for any action taken, suffered or omitted to be taken by the Liquidation Trust Indemnified Parties in connection with the acceptance, administration, exercise and performance of their duties under the Plan or the Liquidation Trust Agreement, as applicable. An act or omission taken with the approval of the Bankruptcy Court, and not inconsistent therewith, will be conclusively deemed not to constitute fraud, gross negligence, or willful misconduct. In addition, the Liquidation Trust shall, to the fullest extent permitted by law, indemnify and hold harmless the Liquidation Trust Indemnified Parties, from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, with respect to the Liquidation Trust or the implementation or administration of the Plan if the Liquidation Trust Indemnified Party acted in good faith and in a manner reasonably believed to be in, or not opposed to, the best interest of the Liquidation Trust. To the extent the Liquidation Trust indemnifies and holds harmless any Liquidation Trust Indemnified Parties as provided above, the legal fees and related costs incurred by counsel to the Liquidation Trustee in monitoring or participating in the defense of such claims giving rise to the right of indemnification shall be paid as Liquidation Trust Expenses, subject to a budget to be agreed to by the AHG. The costs and expenses incurred in enforcing the right of indemnification in this Section shall be paid by the Liquidation Trust. This provision shall survive the termination of the Liquidation Trust Agreement and the death, dissolution, liquidation, resignation, replacement, or removal of the Liquidation Trustee.

9.      **Insurance**

The Liquidation Trustee shall be authorized, but not required, to obtain any reasonably necessary insurance coverage, at the Liquidation Trust's sole expense and subject to a budget to be agreed to by the AHG, for itself and its respective agents, including coverage with respect to the liabilities, duties and obligations of the Liquidation Trustee, which insurance coverage may, at the sole option of the Liquidation Trustee, be extended for a reasonable period after the termination of the Liquidation Trust Agreement.

10.     **Dissolution of the Liquidation Trust**

In no event shall the Liquidation Trust be dissolved later than five years from the Effective Date unless the Bankruptcy Court, upon motion made within the six month period before such fifth anniversary (and, in the event of further extension, by order of the Bankruptcy Court, upon motion made at least six months before the end of the preceding extension), determines that a fixed period extension is necessary to facilitate or complete the recovery on, and liquidation of, the Liquidation Trust Assets.

11.     **Records**

The Liquidation Trustee shall be provided with originals or copies of or access to all documents and business records of the Debtors necessary for the disposition of Liquidation Trust Assets and objections to Disputed Claims.

**12.      Tax Treatment; No Successor in Interest**

The Liquidation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust described in Treasury Regulation section 301.7701-4(d) and, to the extent applicable, as one or more Disputed Claims Reserves treated as disputed ownership funds described in Treasury Regulation section l.468B-9.  For U.S. federal income tax purposes, the transfer of assets by the Debtors to the Liquidation Trust will be treated (a) as the transfer of assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Liquidation Trust Assets, subject to any liabilities of the Debtors or the Liquidation Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Liquidation Trust in exchange for the beneficial interests in the Liquidation Trust, and (b) to the extent applicable, as the transfer of assets by the Debtors to one more Disputed Claims Reserves.

**a.      Liquidation Purpose of the Liquidation Trust**

The Liquidation Trust shall be established for the primary purpose of liquidating and distributing the assets transferred to it, in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidation Trust. Accordingly, the Liquidation Trustee shall, in an expeditious but orderly manner, liquidate and convert to Cash the Liquidation Trust Assets, make timely distributions to the Liquidation Trust Beneficiaries, and not unduly prolong its duration. The Liquidation Trust shall not be deemed a successor-in-interest of the Debtors for any purpose other than as specifically set forth in this Plan or in the Liquidation Trust Agreement. The record holders of beneficial interests shall be recorded and set forth in a register maintained by the Liquidation Trustee expressly for such purpose.

The Liquidation Trust is intended to qualify as a "grantor trust" for U.S. federal income tax purposes with the Liquidation Trust Beneficiaries treated as grantors and owners of the Liquidation Trust. For all U.S. federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee and the Liquidation Trust Beneficiaries) shall treat the transfer of the Liquidation Trust Assets by the Debtors to the Liquidation Trust, as set forth in the Liquidation Trust Agreement, as a transfer of such assets by the Debtors to the Holders of Allowed Claims entitled to distributions from the Liquidation Trust Assets, followed by a transfer by such Holders to the Liquidation Trust.  Thus, the Liquidation Trust Beneficiaries shall be treated as the grantors and owners of a grantor trust for U.S. federal income tax purposes.

As soon as practicable after the Effective Date, the Liquidation Trustee shall make a good faith determination of the fair market value of the Liquidation Trust Assets as of the Effective Date. This valuation shall be used consistently by all parties (including the Debtors, the Liquidation Trustee, and the Liquidation Trust Beneficiaries) for all U.S. federal income tax purposes. The Bankruptcy Court shall resolve any dispute regarding the valuation of the Liquidation Trust Assets.

The right and power of the Liquidation Trustee to invest the Liquidation Trust Assets, the proceeds thereof or any income earned by the Liquidation Trust, shall be limited to the right and power that a liquidating trust, within the meaning of section 301.7701-4(d) of the Treasury Regulations, is permitted to hold, pursuant to the Treasury Regulations, or any modification in the IRS guidelines, including Revenue Procedure 94-45, whether set forth in IRS rulings or other IRS pronouncements.  The Liquidation Trustee may expend the Cash of the Liquidation Trust (i) as reasonably necessary to meet contingent liabilities and to maintain the value of the respective assets of the Liquidation Trust during liquidation, (ii) to pay the respective reasonable administrative expenses (including, but not limited to, any Taxes imposed on the Liquidation Trust) and (iii) to satisfy other respective liabilities incurred by the Liquidation Trust in accordance with this Plan and the Liquidation Trust Agreement (including, without limitation, the payment of any Taxes).

**b.      Disputed Claims Reserves**

To the extent applicable, Liquidation Trust Assets reserved for Holders of Disputed Claims, shall be treated as one or more Disputed Claims Reserves.  The Liquidation Trustee shall treat any such Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections consistent with such tax treatment).  The Liquidation Trustee shall be the administrator of any such Disputed Claims

Reserve within the meaning of Treasury Regulation section 1.468B-9(b)(2) and shall be responsible for all Tax reporting and withholding required by any such Disputed Claims Reserve.

### 13. Settlement of Claims

Except as otherwise provided in this Plan or the Liquidation Trust Agreement, on and after the Effective Date, the Liquidation Trustee may compromise or settle any Claims  without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, and may pay the charges that it incurs on or after the Effective Date for Liquidation Trust Expenses without application to the Bankruptcy Court; provided, however, that settlements with respect to claims or disputes with an amount in controversy in excess of $500,000 shall require the approval of the Oversight Committee.

### 14. Sales of Assets by Liquidation Trust

Subject to the AHG's consent, the Liquidation Trustee may conduct any sales or liquidations of non-Cash Liquidation Trust Assets on any terms it deems reasonable, without further order of the Bankruptcy Court.  Upon the sale, liquidation, transfer or other disposition of the Liquidation Trust Assets by the Liquidation Trustee, the Liquidation Trustee shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more Trust Accounts.

## B. Corporate Actions

### 1. Directors and Officers

Effective as of the Effective Date, all directors and officers of the Debtors shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

### 2. Sole Recourse

Except as otherwise set forth in this Plan or other Final Orders of the Bankruptcy Court, Holders of Allowed Claims against any Debtor will have recourse solely to the assets of the Liquidation Trust for the payment of their Allowed Claims in accordance with the terms of this Plan and the Liquidation Trust Agreement.

## C. Creation and Maintenance of Trust Accounts

### 1. Creation of Trust Accounts

On or prior to the Effective Date, appropriate Trust Accounts will be established and maintained in one or more federally insured domestic banks in the name of the Liquidation Trust. Cash deposited in the Trust Accounts will be invested, held, and used solely as provided in the Liquidation Trust Agreement.  The Liquidation Trustee is authorized to establish additional Trust Accounts after the Effective Date, consistent with the terms of the Liquidation Trust Agreement.

### 2. Additional Funding of Trust Accounts

After the funding of the Trust Accounts on the Effective Date, the Trust Accounts will be funded, as applicable, by Cash proceeds obtained through litigation or the disposition of Liquidation Trust Assets.

### 3. Closure of Trust Accounts

Upon obtaining an order of the Bankruptcy Court authorizing closure of the Debtors' Chapter 11 Cases, any funds remaining in the Trust Accounts shall be distributed in accordance with this Plan and the Liquidation Trust Agreement, and the Trust Accounts may be closed.

**D.      Preservation of Causes of Action**

Except as provided in this Plan or in any contract, instrument, release or other agreement entered into or delivered in connection with this Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Liquidation Trust or Liquidation Trustee on its behalf (solely to the extent provided in the Plan and the Liquidation Trust Agreement) will retain and may enforce the Retained Causes of Action.  The Liquidation Trust or Liquidation Trustee on its behalf (solely to the extent provided in the Plan and the Liquidation Trust Agreement) and in consultation with the Oversight Committee may (i) pursue and (ii) settle any such Retained Cause of Action, as appropriate, in accordance with the best interests of the Liquidation Trust Beneficiaries, without further order of the Bankruptcy Court; provided, however, that settlements with respect to claims or disputes with an amount in controversy in excess of $500,000 shall require the approval of the Oversight Committee.

A nonexclusive schedule of Retained Causes of Action shall be Filed as part of the Plan Supplement.  Except as otherwise provided in this Section V.D, in accordance with and subject to any applicable law, the Debtors' inclusion or failure to include any right of action or claim shall not be deemed an admission, denial or waiver of any claims, demands, rights or Causes of Action that any Debtor or Estate may hold against any Entity.

**E.      Cancellation and Surrender of Instruments, Securities and Other Documentation**

Except as provided in (1) any contract, instrument or other agreement or document entered into or delivered in connection with this Plan or (2) any of the asset sales effectuated during the pendency of the Debtors' Chapter 11 Cases, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all notes, instruments, certificates and other documents evidencing Claims or Interests (except the Prepetition Credit Agreement, DIP Credit Agreement, Interim DIP Order, Final DIP Order, Committee Settlement Agreement and any related loan documents of the Secured Parties) shall be deemed canceled and surrendered and of no further force and effect against the Debtors or the Liquidation Trust, without any further action on the part of any Debtor, the Liquidation Trust or the Liquidation Trustee.

**F.      Effectuating Documents; Further Transactions**

On and after the Effective Date, the Liquidation Trust and the Liquidation Trustee are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and evidence the terms and conditions of this Plan in the name of and on behalf of the Debtors or the Liquidation Trust, as applicable, without the need for any approvals, authorization or consents except those expressly required pursuant to this Plan.

**G.      Substitution in Pending and Future Legal Actions**

On the Effective Date, the Liquidation Trustee, solely in his or her capacity as the trustee for the Liquidation Trust, shall be deemed to be substituted as the party to any Retained Causes of Action including (1) pending contested matters or adversary proceedings in the Bankruptcy Court, (2) any appeals of orders of the Bankruptcy Court, (3) any state court or federal or state administrative proceedings pending as of the Petition Date, and (4) any future actions. The Liquidation Trustee, and its professionals, as applicable, may, but are not required to, take such steps as are appropriate to provide notice of such substitution.

**ARTICLE VI**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.      Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in this Plan, each of the Debtors' Executory Contracts and Unexpired Leases not previously assumed or rejected pursuant to an order of the Bankruptcy Court shall be deemed rejected as of the Effective Date in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for any Executory Contract or Unexpired Lease Filed as part of the Plan Supplement as an Executory Contract or Unexpired Lease designated for assumption and assignment to the Liquidation Trust, (2)

that is the subject of a separate motion or notice to assume or reject Filed by a Debtor and pending as of the Effective Date or (3) that previously expired or terminated pursuant to its own terms.

Except as otherwise previously approved by an order of the Bankruptcy Court, entry of the Confirmation Order by the Bankruptcy Court shall constitute an order, pursuant to sections 365(a) and 1123 of the Bankruptcy Code, approving the assumptions and assignments and the rejections of such Executory Contracts and Unexpired Leases as set forth in the preceding paragraph. Unless otherwise indicated herein, assumptions and assignments and rejections of Executory Contracts and Unexpired Leases pursuant to this Plan shall be effective as of the Effective Date. Each Executory Contract or Unexpired Lease assumed pursuant to this Plan or by Bankruptcy Court order and not assigned to a third party on or before the Effective Date shall vest in and be fully enforceable by the Liquidation Trust in accordance with its terms, except as such terms may have been modified by the provisions of this Plan or any order of the Bankruptcy Court authorizing its assumption pursuant to section 365 of the Bankruptcy Code; provided that if an assignment is pending as of the Effective Date, the Liquidation Trustee shall be authorized to take any and all actions necessary to implement such assignment.

To the maximum extent permitted by law, to the extent any provision (including, without limitation, any "change of control" provision) in any Executory Contract or Unexpired Lease assumed pursuant to this Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such Executory Contract or Unexpired Lease, then such provision shall be deemed modified such that the assumption and assignment contemplated by this Plan shall not entitle the counterparty thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

## B.      Cure of Defaults for Executory Contracts and Unexpired Leases Assumed by the Liquidation Trust

With respect to any Executory Contract or Unexpired Lease assumed by the Liquidation Trust, any Cure Amount Claim shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Allowed amount of such Cure Amount Claim in Cash on the Effective Date or as reasonably practicable thereafter, subject to the limitations described below, or on such other terms as the parties to any particular Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding: (1) the Allowed amount of any Cure Amount Claim; (2) the ability of the Liquidation Trust or another assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed; or (3) any other matter pertaining to assumption, no payments on account of the Cure Amount Claim shall be made until such dispute is resolved by a Final Order. At least 14 days before the Combined Hearing, the Debtors shall file and distribute, or cause to be distributed, notices of proposed assumption and proposed amounts of Cure Amount Claims to the applicable counterparties. Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption and assignment or the related amount of the Cure Amount Claim must be Filed, served and actually received by the Debtors on the later of: (1) three days before the date of the Combined Hearing; and (2) seven days after receiving notice of any amendment, modification or supplement to the Plan Supplement. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption and assignment or Cure Amount Claim will be deemed to have assented to such assumption and assignment or Cure Amount Claim.

Payment of the Allowed Cure Amount Claim upon the assumption and assignment of any Executory Contract or Unexpired Lease pursuant to this Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, under such Executory Contract or Unexpired Lease occurring at any time prior to the effective date of the assumption and assignment.

## C.      Claims Based on Rejection of Executory Contracts and Unexpired Leases

Unless otherwise provided by a Bankruptcy Court order, including the Bar Date Order, any proofs of Claim asserting Claims arising from the rejection of any Executory Contracts and Unexpired Leases pursuant to this Plan must be Filed with the Claims and Noticing Agent within 30 days after the date of service of an order of the Bankruptcy Court (which may include any notice of entry of the Confirmation Order) approving such rejection.

The Liquidation Trust reserves the right to object to, settle, compromise, or otherwise resolve any Claim Filed on account of a rejected Executory Contract or Unexpired Lease.

**Holders of Claims arising from the rejection of Executory Contracts and Unexpired Leases with respect to which no proof of Claim is timely Filed will be forever barred from asserting a Claim against the Debtors, the Estates, the Liquidation Trust, or the property of any of the foregoing, unless otherwise expressly allowed by the Bankruptcy Court.**

**D.      Contracts and Leases Entered Into After the Petition Date**

Contracts and leases entered into or assumed by a Debtor after the Petition Date (other than the Sale APAs and all ancillary documents to the foregoing) that were not assigned to the Liquidation Trust shall be considered repudiated by the applicable Debtor as of the Effective Date, and the counterparties to such contracts, if they believe that such repudiation constitutes a breach of such contract or lease, must File a Claim within 30 days after the Effective Date in accordance with this Plan or have their rights forever waived and released.

**E.      Insurance Policies**

Notwithstanding Section VI.A to the contrary, all rights of the Debtors under the Insurance Policies, including any surety bonds, guarantees or other similar rights shall automatically become vested in the Liquidation Trust as of the Effective Date without necessity for further approvals or orders, however, to the extent that any of the rights of a Debtor or Debtors in one or more of said Insurance Policies are disputed in a court proceeding, or otherwise by any insurance company that issued one or more of such Insurance Policies, all rights of the Debtors under the Insurance Policies shall mean any such rights as are finally determined by the Court having jurisdiction over such dispute or by the terms of any settlement thereof.

To the extent that any such Insurance Policies are deemed Executory Contracts, then, unless such Insurance Policies have been rejected pursuant to an order of the Bankruptcy Court (including the Confirmation Order), notwithstanding anything to the contrary in this Plan, this Plan shall constitute a motion to assume and assign to the Liquidation Trust, permit to "ride through" or ratify such Insurance Policies, including any surety bonds, guarantees, or other similar rights.  Subject to the occurrence of the Effective Date, the entry of the Confirmation Order shall constitute both approval of such assumption and assignment pursuant to section 365 of the Bankruptcy Code and a finding by the Bankruptcy Court that such assumption and assignment is in the best interests of the Estates.  Unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed upon by the parties prior to the Effective Date, no payments shall be required to cure any defaults existing as of the Confirmation Date with respect to any Insurance Policy, surety bond, guarantee, or similar agreements assumed and assigned to the Liquidation Trust pursuant to this Section VI.E.  Nothing in this Plan shall impair the rights of the Liquidation Trust with respect to (or affect the coverage under) any Insurance Policy that provides liability coverage for officers, directors and other fiduciaries of the Debtors and their Affiliates, or any surety bond, guarantees or similar rights. For the avoidance of doubt, any Causes of Action brought by the Liquidation Trustee on behalf of the Liquidation Trust shall not be subject to an "insured vs. insured" exclusion to coverage under the Insurance Policies, to the extent applicable.

**F.      Reservation of Rights**

Nothing contained in this Plan or the Plan Supplement, nor the Debtors' delivery of a notice of proposed assumption and proposed Cure Amount Claim to an applicable counterparty, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired on the Effective Date, the Liquidation Trustee shall have 30 days following entry of a Final Order resolving such dispute to determine whether to alter the treatment of such contract or lease hereunder.

## ARTICLE VII
## CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW.  HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.      The Plan May Not Be Accepted**

The Debtors can make no assurances that the requisite acceptances of the Plan will be received.  In the event that the Plan is accepted by creditors of one, but not the other creditors of the Debtors, the case(s) of the Debtor(s) not receiving requisite creditor acceptances may be converted to chapter 7 of the Bankruptcy Code, and Confirmation will be sought only with respect to the Debtor(s) for which requisite creditor acceptances were obtained.

**B.      The Plan May Not Be Confirmed**

Even if the Debtors receive the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determined that the Combined Plan and Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation have not been met.  Moreover, there can be no assurance that modifications to the Combined Plan and Disclosure Statement will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes.  If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 reorganization or liquidation of the Debtors' assets could be implemented and what distribution the Holders of Allowed Claims would receive.  If an alternative could not be agreed to, it is possible that the Debtors would have to liquidate their remaining assets in chapter 7, in which case it is likely that the Holders of Allowed Claims would receive less favorable treatment than they would receive under the Plan.  There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtors' creditors as those proposed in the Plan.

**C.      Some or All of the Chapter 11 Cases May Be Converted to Chapter 7**

If the confirmation requirements of section 1129 of the Bankruptcy Code, or the conditions precedent set forth in Section X.A hereof, are not satisfied with respect to one Debtor, then such Debtor's case may be converted to chapter 7, while the Debtors seek confirmation of the Plan with respect to the remaining Debtors.

**D.      Distributions to Holders of Allowed Claims Under the Plan May Be Inconsistent with Projections**

Projected distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for distribution.  There can be no assurance that the estimated Claim amounts set forth in the Plan are correct.  These estimated amounts are based on certain assumptions with respect to a variety of factors.  Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Debtors' estimates.  If the total amount of Allowed Claims in a Class is higher than the Debtors' estimates, or the funds available for distribution to such Class are lower than the Debtors' estimates, the percentage recovery to Holders of Allowed Claims in such Class will be less than projected.

**E.      Objections to Classification of Claims**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims and Interests.  The Bankruptcy Code also provides that the Plan may place a Claim or Interest in a particular Class only if such Claim or Interest is

substantially similar to the other Claims or Interests of such Class.  The Debtors believe that all Claims and Interests have been appropriately classified in the Plan.  To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Debtors would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any Holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such Holder ultimately is deemed to be a member.  Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such Holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires re-solicitation, the Debtors will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan by any Holder of Claims pursuant to this solicitation will constitute consent to the Plan's treatment of such Holder, regardless of the Class as to which such Holder is ultimately deemed to be a member.  The Debtors believe that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any Holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the Holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest.  The Debtors believe that the Plan complies with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny Confirmation of the Plan.  Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

## F.    Failure to Consummate the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to the Effective Date.  Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated.

## G.    Debtor Release and/or Injunction Provisions May Not Be Approved

The Combined Plan and Disclosure Statement contains Debtor releases and certain exculpations and injunction language.  Parties are urged to read these provisions carefully to understand how Confirmation and Consummation of the Plan will affect any Claim, interest, right, or action with regard to the Debtor and certain third parties.

THE COMBINED PLAN AND DISCLOSURE STATEMENT SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER APPLICABLE LAW.

There can be no assurance that the Debtor release and injunction, as provided in Section X.F of the Plan, will be granted.  If the Bankruptcy Court does not grant such relief, this may result in (i) confirmation of a plan of liquidation that differs from this Plan or (i) the Plan not being confirmed.

## H.    Reductions to Estimated Creditor Recoveries

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially.  The amount of cash realized from the liquidation of the Debtors' remaining assets could be less than anticipated, which could cause the amount of distributions to creditors to be reduced substantially.

## I.        Certain Tax Considerations

### 1.        Certain U.S. Federal Income Tax Consequences

The following discussion is a summary of certain material U.S. federal income tax consequences of the Combined Plan and Disclosure Statement to the Debtors and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "Internal Revenue Code"), Treasury Regulations promulgated and proposed thereunder (the "Treasury Regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect.  No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Combined Plan and Disclosure Statement and no rulings have been or will be requested from the IRS with respect to any of the issues discussed below.  The discussion below is not binding upon the IRS or the courts.  No representations are being made regarding the particular tax consequences of the Confirmation or implementation of the Combined Plan and Disclosure Statement.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to Holders of Claims subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)). Furthermore, this discussion assumes that a Holder of a Claim holds such claim as a "capital asset" within the meaning of section 1221 of the Internal Revenue Code (generally property held for investment).  This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

For purposes of this discussion, a "U.S. Holder" is a beneficial owner of a Claim that is, for U.S. federal income tax purposes:

      i.    an individual citizen or resident of the United States;

      ii.    a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States, any state therein or the District of Columbia;

      iii.    an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

      iv.    a trust if a court within the United States is (i) able to exercise primary supervision over its administration and one or more United States persons have the authority to control all substantial decisions of the trust, or (ii) otherwise if the trust has a valid election in effect under current Treasury regulations to be treated as a United States person.

A beneficial owner of a Claim that is not a U.S. Holder is a "non-U.S. Holder."

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a Holder of Claims, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership.  A Holder of a Claim that is a partnership and the partners

in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Combined Plan and Disclosure Statement.

THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY, DOES NOT CONSTITUTE TAX ADVICE, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

## 2.        Tax Consequences to the Debtors

The sale of any assets by the Debtors in connection with this Combined Plan and Disclosure Statement has given rise to a taxable gain or loss measured by the difference between the amount realized on the sale and the tax basis of the Debtors in the property that was sold. The character of the gain or loss (i.e., as ordinary or capital gain or loss) depends on the asset in question, the extent to which certain depreciation recapture is involved, and other possible factors under the Internal Revenue Code and/or applicable state and local tax laws, including potential recapture of credits and the tax treatment of such Debtor.

The Internal Revenue Code additionally provides that the amount of any cancellation of debt ("COD") of a solvent taxpayer is included in income.  The amount of COD income realized is generally the excess of the amount of indebtedness discharged over the value of any consideration given in exchange therefor.  Certain statutory or judicial exceptions may apply to limit the amount of COD income incurred for U.S. federal income tax purposes. For example, the discharge of obligations the payment of which would have been deductible for U.S. federal income tax purposes (such as rent) does not give rise to COD income. In addition, COD income is excluded from income if a taxpayer is insolvent (but only to the extent of the taxpayer's insolvency) or if the COD income is realized pursuant to a confirmed plan of reorganization or court order in a chapter 11 bankruptcy case of the taxpayer, such as the Combined Plan and Disclosure Statement.

When the insolvency or bankruptcy exception to COD income inclusion applies, the Internal Revenue Code provides that a taxpayer must reduce certain of its attributes-such as net operating loss ("NOL") carryforwards, capital losses, tax credits, and tax basis in assets-by the amount of any COD excluded from income. The taxpayer can elect to reduce the basis of depreciable property prior to any reduction in its NOL carryforwards or other tax attributes.

Any reduction in tax attributes in respect of excluded COD income does not occur until after the determination of the taxpayer's income or loss for the taxable year in which the COD income is realized. If the amount of COD income exceeds available NOL carryforwards and other tax attributes available for reduction, such excess is permanently excluded from income.

## 3.        Tax Consequences for U.S. Holders of Certain Claims

Generally, a Holder of a Claim should in most, but not all, circumstances recognize gain or loss on the Effective Date equal to the difference between the "amount realized" by such Holder in exchange for its Claim and such Holder's adjusted tax basis in the Claim.  The "amount realized" is equal to the sum of the cash and the fair market value of any other consideration received under the Plan in respect of a Holder's Claim.  The tax basis of a Holder in a Claim will generally be equal to the Holder's cost therefor (subject to the below discussion regarding OID (as defined below)).  To the extent applicable, the character of any recognized gain or loss (e.g., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the Holder, the nature of the Claim in the Holder's hands, the purpose and circumstances of its acquisition, the Holder's holding period of the Claim, and the extent to which the Holder previously claimed a deduction for the worthlessness of all or a portion of the Claim. Generally, if the Claim is a capital asset in the Holder's hands, any gain or loss realized will generally be characterized as capital gain or loss, and will constitute long-term capital gain or loss if the Holder has held such Claim for more than one year.  The deductibility of capital losses is subject to significant limitations under the Internal Revenue Code.

A creditor who receives Cash in satisfaction of its Claims may recognize ordinary income or loss to the extent that any portion of such consideration is characterized as accrued interest or OID. A creditor who did not previously include in income accrued but unpaid interest attributable to its Claim, and who receives a distribution on account of its Claim pursuant to the Plan, will be treated as having received interest income to the extent that any consideration received is characterized for U.S. federal income tax purposes as interest, regardless of whether such creditor realizes an overall gain or loss as a result of surrendering its Claim. A creditor who previously included in its income accrued but unpaid interest attributable to its Claim should recognize an ordinary loss to the extent that such accrued but unpaid interest is not satisfied, regardless of whether such creditor realizes an overall gain or loss as a result of the distribution it may receive under the Plan on account of its Claim. Pursuant to Article VIII of the Plan, distributions with respect to a Claim will be allocated first to the principal portion of such Claim (as determined for U.S. federal income tax purposes) and, thereafter, to the remaining portion of such Claim, if any. However, there is no assurance that such allocation would be respected by the IRS for U.S. federal income tax purposes.

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity). Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

Under the Plan, a portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest or original issue discount ("OID") on such Claims. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors. If the payment does not fully satisfy all principal and interest or OID on Allowed Claims, the extent to which payment will be attributable to accrued interest or OID is unclear. Whether the applicable Holder of such Claims will recognize a loss or any other tax treatment will depend upon facts and circumstances that are specific to the nature of the Holder and its Claims. Creditors should consult their own tax advisors.

4.      **Tax Consequences in Relation to the Liquidation Trust**

As of the Effective Date, the Liquidation Trust will be established for the benefit of the Holders of certain Allowed Claims. The tax consequences of the Plan in relation to the Liquidation Trust and the Beneficiaries thereof are subject to uncertainties due to the complexity of the Plan and the lack of interpretative authority regarding certain changes in the tax law.

Allocations of taxable income of the Liquidation Trust (other than taxable income allocable to the Liquidation Trust's claims reserves) among Holders of Claims will be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidation Trust had distributed all of its assets (valued at their tax book value) to the holders of the beneficial interests in the Liquidation Trust, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidation Trust. Similarly, taxable loss of the Liquidation Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a Liquidation distribution of the remaining trust assets.

The tax book value of the trust assets for this purpose will equal their fair market value on the Effective Date, adjusted in accordance with tax accounting principles prescribed by the Internal Revenue Code, applicable Treasury

Regulations, and other applicable administrative and judicial authorities and pronouncements. Uncertainties with regard to federal income tax consequences of the Plan may arise due to the inherent nature of estimates of value that will impact tax liability determinations.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an IRS private letter ruling if the Liquidation Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidation Trustee), the Liquidation Trustee may (a) elect to treat any trust assets allocable to, or retained on account of, Disputed Claims (the "Trust Claims Reserve") as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, any Trust Claims Reserve will be subject to tax annually on a separate entity basis on any net income earned with respect to the trust assets in such reserves, and all distributions from such reserves will be treated as received by Holders in respect of their Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidation Trustee, and the holders of beneficial interests in the Liquidation Trust) will be required to report for tax purposes consistently with the foregoing. The Trust Claims Reserve will be responsible for payment, out of the assets of the Trust Claims, of any taxes imposed on the Trust Claims or its assets. In the event, and to the extent, any Cash in the Trust Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Trust Claims Reserve may be sold to pay such taxes.

The Liquidation Trust is intended to qualify as a liquidation trust for federal income tax purposes. In general, a liquidation trust is not a separate taxable entity but rather is treated for federal income tax purposes as a "grantor" trust (i.e., a pass-through entity). The IRS, in Revenue Procedure 94–45, 1994.28 I.R.B. 124, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan. The Liquidation Trust has been structured with the intention of complying with such general criteria. Pursuant to the Plan and Liquidation Trust Agreement, and in conformity with Revenue Procedure 94-45, *supra*, all parties (including the Debtors, the Liquidation Trustee, and the holders of beneficial interests in the Liquidation Trust) are required to treat for federal income tax purposes, the Liquidation Trust as a grantor trust of which the Holders of the applicable Allowed Claims are the owners and grantors, and treat the holders of interests in the Liquidation Trust as the direct owners of an undivided interest in the Liquidation Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein. While the following discussion assumes that the Liquidation Trust would be so treated for federal income tax purposes, no ruling has been requested from the IRS concerning the tax status of the Liquidation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position to the classification of the Liquidation Trust as a grantor trust. If the IRS were to successfully challenge such classification, the federal income tax consequences to the Liquidation Trust and the Beneficiaries thereof could materially vary from those discussed herein.

In general, each creditor who is a Beneficiary of the Liquidation Trust will recognize gain or loss on the Effective Date in an amount equal to the difference between (i) the "amount realized" by such Beneficiary in satisfaction of its applicable Allowed Claim, and (ii) such Beneficiary's adjusted tax basis in such Claim. The "amount realized" by a Beneficiary will equal the sum of cash and the aggregate fair market value of the property received by such party pursuant to the Plan (such as a Beneficiary's undivided beneficial interest in the assets transferred to the Liquidation Trust). Where gain or loss is recognized by a Beneficiary in respect of its Allowed Claim, the character of such gain or loss (i.e., long-term or short-term capital, or ordinary income) will be determined by a number of factors including the tax status of the party, whether the Claim constituted a capital asset in the hands of the party and how long it had been held, whether the Claim was originally issued at a discount or acquired at a market discount and whether and to what extent the party had previously claimed a bad debt deduction in respect of the Claim.

After the Effective Date, any amount that a creditor receives as a distribution from the Liquidation Trust in respect of its beneficial interest in the Liquidation Trust should not be included, for federal income tax purposes, in the party's amount realized in respect of its Allowed Claim but should be separately treated as a distribution received in respect of such party's beneficial interest in the Liquidation Trust.

In general, a Beneficiary's aggregate tax basis in its undivided beneficial interest in the assets transferred to the Liquidation Trust will equal the fair market value of such undivided beneficial interest as of the Effective Date and the Beneficiary's holding period in such assets will begin the day following the Effective Date. Distributions to

any Beneficiary will be allocated first to the original principal portion of the Beneficiary's Allowed Claim as determined for federal tax purposes, and then, to the extent the consideration exceeds such amount, to the remainder of such Claim. However, there is no assurance that the IRS will respect such allocation for federal income tax purposes.

For all federal income tax purposes, all parties (including the Debtors, the Liquidation Trustee, and the holders of beneficial interests in the Liquidation Trust) will treat the transfer of assets to the Liquidation Trust, in accordance with the terms of the Plan and Liquidation Trust Agreement, as a transfer of those assets directly to the Holders of the applicable Allowed Claims followed by the transfer of such assets by such Holders to the Liquidation Trust. Consistent therewith, all parties will treat the Liquidation Trust as a grantor trust of which such Holders are to be owners and grantors. Thus, such Holders (and any subsequent holders of interests in the Liquidation Trust) will be treated as the direct owners of an undivided beneficial interest in the assets of the Liquidation Trust for all federal income tax purposes. Accordingly, each holder of a beneficial interest in the Liquidation Trust will be required to report on its federal income tax return(s) the holder's allocable share of all income, gain, loss, deduction or credit recognized or incurred by the Liquidation Trust.

The Liquidation Trust's taxable income will be allocated to the holders of beneficial interests in the Liquidation Trust in accordance with each such holder's *pro rata* share pursuant to Section III.E and Article VIII of the Plan. The character of items of income, deduction and credit to any holder and the ability of such holder to benefit from any deductions or losses may depend on the particular situation of such holder.

The federal income tax reporting obligation of a holder of a beneficial interest in the Liquidation Trust is not dependent upon the Liquidation Trust distributing any cash or other proceeds. Therefore, a holder of a beneficial interest in the Liquidation Trust may incur a federal income tax liability regardless of the fact that the Liquidation Trust has not made, or will not make, any concurrent or subsequent distributions to the holder. If a holder incurs a federal tax liability but does not receive distributions commensurate with the taxable income allocated to it in respect of its beneficial interests in the Liquidation Trust it holds, the holder may be allowed a subsequent or offsetting loss. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Claim), a distribution of Cash by the Liquidation Trust will not be separately taxable to a holder of interests in the Liquidation Trust since the beneficiary is already regarded for U.S. federal income tax purposes as owning the underlying assets (and was taxed at the time the Cash was earned or received by the Liquidation Trust). Holders are urged to consult their tax advisors regarding the appropriate U.S. federal income tax treatment of any subsequent distributions of Cash originally retained by the Liquidation Trust on account of Disputed Claims.

The Liquidation Trustee will file with the IRS returns for the Liquidation Trust as a grantor trust pursuant to Treasury Regulations section 1.671-4(a). The Liquidation Trust will also send to each holder of a beneficial interest in the Liquidation Trust a separate statement setting forth the holder's share of items of income, gain, loss, deduction or credit and will instruct the holder to report such items on its federal income tax return.

Events subsequent to the date of this Disclosure Statement, such as the enactment of additional tax legislation, could also change the federal income tax consequences of the Plan and the transactions contemplated thereunder.

5.    **Information Reporting and Withholding**

In connection with the Combined Plan and Disclosure Statement, the Debtors and the Liquidation Trustee will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Plan will be subject to those withholding and information reporting requirements. Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Plan. In the case of any non-U.S. Holders, the Liquidation Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate or is otherwise excluded from withholding). As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the tax consequences to non-U.S. Holders. Accordingly, such non-U.S. Holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidation Trust.

In general, information reporting requirements may apply to Distributions pursuant to the Plan. Additionally, under the backup withholding rules, a Holder may be subject to backup withholding with respect to Distributions made pursuant to the Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding. Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Combined Plan and Disclosure Statement would be subject to these regulations and require disclosure on the Holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND DOES NOT CONSTITUTE TAX ADVICE. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE COMBINED PLAN AND DISCLOSURE STATEMENT.

## ARTICLE VIII
## PROVISIONS REGARDING DISTRIBUTIONS

**A.      Distributions for Claims Allowed as of the Effective Date**

Except as otherwise provided in this Article VIII, Distributions to be made on the Effective Date to Holders of Allowed Claims as provided by Article III or this Article VIII shall be deemed made on the Effective Date if made on the Effective Date or as promptly thereafter as practicable by the Liquidation Trust.

**B.      Method of Distributions to Holders of Claims**

All Distributions to be made under this Plan shall be made by the Disbursing Agent or such Third Party Disbursing Agents as the Liquidation Trustee may employ, subject to the approval of the Oversight Committee. Each Disbursing Agent may serve without bond, and any Disbursing Agent may employ or contract with other Entities to assist in or make the Distributions required by this Plan, if approved by the Liquidation Trustee.

**C.      Disbursing Agent**

**1.      Powers of the Disbursing Agent**

Without further order of the Bankruptcy Court, the Disbursing Agent shall be empowered to: (a) make all Distributions contemplated in this Plan; (b) effectuate all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Plan; and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to this Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

**2.      Expenses Incurred on or After the Effective Date**

Except as otherwise ordered by the Bankruptcy Court, consistent with Section III.C.1.d. of the Plan, the amount of any reasonable fees and out-of-pocket expenses incurred by a Disbursing Agent on or after the Effective

Date (including Taxes) and any reasonable compensation to such Disbursing Agent for services rendered shall be paid in Cash by the Liquidation Trustee from the Liquidation Trust Assets in accordance with the terms of the Liquidation Trust Agreement and subject to a budget to be agreed to by the AHG.

### 3.     No Liability

Except on account of gross negligence or willful misconduct, the Disbursing Agent shall have no (a) liability to any party for actions taken in accordance with this Plan or in reliance upon information provided to it in accordance with this Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a Distribution is made or who does not otherwise comply with the terms of this Plan.

## D.     Disputed Claims Reserves

### 1.     Establishment of Disputed Claims Reserves

On the Effective Date or as soon thereafter as is reasonably practicable, the Liquidation Trustee may establish a Disputed Claims Reserve for Disputed General Unsecured Claims, which the Liquidation Trustee shall administer. In the event of a Distribution, the Liquidation Trustee shall reserve, in Cash or other property, on account of the full asserted amount (or such lesser amount as may be determined or estimated by the Bankruptcy Court after notice and a hearing in accordance with Article VIII.N hereof) with respect to each such Disputed Claim (e.g., with respect to a General Unsecured Claim, the Holder's then-current Pro Rata share of the proposed Distribution). For the avoidance of doubt, the Liquidation Trustee may administer the Disputed Claims Reserve by book entry.

### 2.     Maintenance of Disputed Claims Reserves

To the extent that the property placed in the Disputed Claims Reserve consists of Cash, that Cash shall be deposited in an interest-bearing account. The property in the Disputed Claims Reserve shall be held in trust for the benefit of the Holders of Claims ultimately determined to be Allowed Claims. The Disputed Claims Reserve shall be closed by the Liquidation Trustee when all Distributions required to be made under this Plan to the Holders of General Unsecured Claims will have been made in accordance with the terms of this Plan. Upon closure of the Disputed Claims Reserve, all Cash (including any investment yield on the Cash) and other property held in the Disputed Claims Reserve shall be distributed in accordance with this Plan or the Liquidation Trust Agreement, as applicable.

## E.     Investment of Trust Accounts

To assist in making distributions under this Plan, the Trust Accounts may be held in the name of the Liquidation Trustee or in the name of one or more Third Party Disbursing Agents for the benefit of Holders of Allowed Claims under this Plan, or a secondary Trust Account may be created in the name of the Third Party Disbursing Agent for the purpose of making disbursements. The Liquidation Trustee may invest, or may direct the Third Party Disbursing Agents to invest, Cash in the Trust Accounts, subject to any limitations established by the Liquidation Trust Agreement; provided, however, that should the Liquidation Trustee determine, in its sole discretion, that the administrative costs associated with such investment will exceed the return on such investment, it may direct the Third Party Disbursing Agent not to invest such Cash. Distributions of Cash from accounts held by Third Party Disbursing Agents will include a Pro Rata share of any interest or other proceeds, if any, from such investment of Cash, net of any Taxes payable with respect thereto.

## F.     Delivery of Distributions and Undeliverable or Unclaimed Distributions

### 1.     Delivery of Distributions

Distributions to holders of Allowed Claims will be made by a Disbursing Agent: (a) at the addresses set forth on the respective proofs of Claim Filed by Holders of such Claims or requests for payment of Administrative Expense Claims, as applicable; (b) at the address for a Claim transferee set forth in a valid and timely notice of transfer of Claim Filed with the Bankruptcy Court; (c) at the addresses set forth in any written notice of address change Filed

with the Bankruptcy Court or delivered to the Disbursing Agent after the date of Filing of any related proof of Claim; (d) at the addresses reflected in the applicable Debtor's Schedules if no proof of Claim has been Filed and the Disbursing Agent has not received a written notice of a change of address; or (e) if clauses (a) through (d) are not applicable, at the last address directed by such holder after such Claim becomes an Allowed Claim.

### 2. Undeliverable Distributions Held by Disbursing Agents

#### a. Holding of Undeliverable Distributions

If any Distribution to a Holder of an Allowed Claim is returned to a Disbursing Agent as undeliverable, no further Distributions will be made to such Holder unless and until the applicable Disbursing Agent is notified by written certification of such Holder's then-current address.  Subject to Section VIII.F.2.c below, Distributions returned to a Disbursing Agent or otherwise undeliverable will remain in the possession of the applicable Disbursing Agent until such time as a Distribution becomes deliverable.  Subject to Section VIII.F.2.c, while remaining in the possession of the applicable Disbursing Agent, undeliverable Distributions will be held for the benefit of the potential claimants of such Distributions.

#### b. After Distributions Become Deliverable

On each Distribution Date, the applicable Disbursing Agent will make all Distributions that became deliverable to holders of Allowed Claims after the most recent Distribution Date.  Notwithstanding the foregoing, the applicable Disbursing Agent reserves the right, if it determines a Distribution on any Distribution Date is uneconomical or unfeasible, or is otherwise unadvisable, to postpone a Distribution Date.

#### c. Failure to Claim Undeliverable Distributions

Any Holder of an Allowed Claim that does not assert its right to an undeliverable Distribution prior to the date that is 60 days prior to the Final Distribution Date will be forever barred from asserting any such Claim against the Debtors, the Estates, the Liquidation Trust, the Liquidation Trustee, or the property of any of the foregoing.  In such cases, unclaimed Distributions will be maintained for redistribution to other claimants entitled to Distributions pursuant to the Plan.

### G. Distribution Record Date

As of 5:00 p.m. (prevailing Eastern Time) on the Distribution Record Date, the transfer registers for Claims shall be closed.  The Debtors and the Liquidation Trustee shall have no obligation to recognize any transfer of a Claim (i) occurring after 5:00 p.m. (prevailing Eastern Time) on the Confirmation Date, or (ii) that does not comply with the Bankruptcy Code or Bankruptcy Rules, including Bankruptcy Rule 3001(e).

### H. *De Minimis* Distributions

No Distribution of less than $50 shall be made by the Disbursing Agent.  Each such Distribution shall revest in the Liquidation Trust for distribution to Holders of other Allowed Claims in the applicable Class in accordance with this Plan.  Whenever a payment of a fraction of a dollar would otherwise be called for, the actual payment may reflect a rounding down to the nearest whole dollar.

### I. Compliance with Tax Requirements

In connection with this Plan, the Disbursing Agent shall comply with all Tax withholding and reporting requirements imposed on them by any Governmental Unit, and all Distributions shall be subject to such withholding and reporting requirements.  Notwithstanding any provision in this Plan to the contrary, the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the Distribution to generate sufficient funds to pay applicable withholding Taxes, withholding Distributions pending receipt of information necessary to facilitate such Distributions or establishing any other mechanisms the Disbursing Agent believes are reasonable and appropriate.  The Disbursing Agent shall have

the right to allocate all Distributions in compliance with applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.

The Disbursing Agent shall be authorized to require each Holder of a Claim to provide it with an executed Form W-9, Form W-8 or other appropriate tax form or documentation as a condition precedent to being sent a Distribution. The applicable Disbursing Agent shall provide advance written notice of such requirement to each Holder of a Claim affected thereby. The notice shall provide each Holder of a Claim with a specified time period after the date of mailing of such notice to provide an executed Form W-9, Form W-8 or other tax form or documentation to the Disbursing Agent. If a Holder of an Allowed Claim does not provide the Disbursing Agent with an executed Form W-9, Form W-8 or other tax form or documentation within the time period specified in such notice, or such later time period agreed to by the Disbursing Agent in writing in its discretion, then the Disbursing Agent, in its sole discretion, may (1) make a Distribution net of any applicable withholding or (2) determine that such Holder shall be deemed to have forfeited the right to receive any Distribution, in which case, any such Distribution shall revert to the Liquidation Trust for Distribution on account of other Allowed Claims pursuant to the Plan and the Claim of the Holder originally entitled to such Distribution shall be waived and forever barred without further order of the Bankruptcy Court.

**J.      Manner of Payment Under the Plan**

Unless a Holder of an Allowed Claim and the Disbursing Agent otherwise agree, any Distribution to be made in Cash shall be made, at the election of the Disbursing Agent, by check drawn on a domestic bank or by wire transfer from a domestic bank. Cash payments to foreign creditors may, in addition to the foregoing, be made at the option of the Disbursing Agent in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**K.      Time Bar to Cash Payments**

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 180 days after the date of issuance thereof. Requests for reissuance of any voided check shall be made directly to the Disbursing Agent by the Entity to whom such check was originally issued. Any claims in respect of such voided check shall be forever barred and such unclaimed Distribution shall be re-allocated as set forth in Section VIII.F.2.c of this Plan, notwithstanding any federal or state escheat laws to the contrary.

**L.      Setoffs**

Except with respect to Claims released pursuant to this Plan or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disbursing Agent may, pursuant to section 553 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Claim (and the Distributions to be made on account of such Claim), counterclaims, rights and causes of action of any nature that such Debtor may hold against the Holder of such Claim; provided, however, that the failure to effectuate such a setoff shall not constitute a waiver or release by the applicable Debtor, the Liquidation Trust or the Disbursing Agent of any Causes of Action that the Debtors or Liquidation Trust may possess against the Holder of a Claim.

**M.      Allocation Between Principal and Accrued Interest**

Interest shall not accrue on any Holder's Claim entitled to a Distribution from the Liquidation Trust Assets in respect of the period from the Petition Date to the date a final Distribution is made on such Claim. To the extent that any Allowed Claim entitled to a Distribution from the Liquidation Trust Assets consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such Distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts.

**N.     Distributions to Holders of Disputed Claims**

Notwithstanding any other provision of this Plan: (1) no Distributions will be made on account of a Disputed Claim until such Claim becomes an Allowed Claim, if ever; and (2) except as otherwise agreed to by the relevant parties, no partial Distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order.

To the extent that a Disputed Claim becomes an Allowed Claim, any Distributions shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan.  On the Distribution Date that is at least 30 days after a Disputed Claim becomes an Allowed Claim (or such lesser period as the Disbursing Agent may determine), the Holder of such Claim shall receive any Distribution to which such Holder would have been entitled under the Plan as of the Effective Date (including any Distribution such Holder would have been entitled to on the Distribution Date on which such Holder is receiving its initial Distribution) if such claim had been Allowed as of the Effective Date, without any interest to be paid on account of such Claim.

**O.     Claims Paid or Payable by Third Parties**

**1.     Claims Paid by Third Parties**

To the extent that the Holder of an Allowed Claim receives a Third Party Payment, the Liquidation Trustee shall be authorized to reduce, for the purposes of Distribution, the Allowed amount of such Claim by the amount of the Third Party Payment.

**2.     Claims Payable by Insurance**

No Distributions shall be made on account of any Allowed Claim that is payable pursuant to an Insurance Policy until the Holder of such Allowed Claim has exhausted all remedies with respect to such Insurance Policy.

Except as otherwise provided in this Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable Insurance Policy.  Nothing contained in this Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any other Entity may hold against any other Entity, including insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE IX**
**DISPUTED, CONTINGENT AND UNLIQUIDATED CLAIMS**

**A.     Allowance of Claims**

After the Effective Date and as applicable, the Liquidation Trustee shall have any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, except with respect to any Claim deemed Allowed or released under this Plan.

Any Claim that has been listed in the Schedules as disputed, contingent, or unliquidated, and for which no proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.

**B.     Prosecution of Objections to Claims**

**1.     Authority to Prosecute and Settle Claims**

Except as otherwise specifically provided in this Plan, the Debtors, prior to the Effective Date, and the Liquidation Trustee, on and after the Effective Date, as applicable, shall have the authority to: (a) File, withdraw or litigate to judgment, objections to Claims; (b) settle or compromise any Disputed Claim (other than a Professional Fee Claim) without any further notice to or action, order or approval by the Bankruptcy Court; and (c) direct the Claims

and Noticing Agent to adjust the claims register to reflect any such resolutions without any further notice to or action, order or approval by the Bankruptcy Court. Notwithstanding the foregoing, the Liquidation Trustee shall not be obligated to object to Claims unless, in consultation with the Oversight Committee, the Liquidation Trustee determines that there is a reasonable prospect of a distribution to creditors net of expenses associated with such Claim objections.

### 2. Authority to Amend Schedules

The Liquidation Trustee will have the authority to amend the Schedules with respect to any Claim, and will have the authority to make distributions based on such amended Schedules (if no proof of Claim is timely Filed in response thereto) without approval of the Bankruptcy Court. If any such amendment to the Schedules reduces the amount of a Claim or changes the nature or priority of a Claim, the Liquidation Trustee, in accordance with the Bar Date Order, will provide the Holder of such Claim with notice of such amendment and such Holder will have 30 days to File an objection to such amendment in the Bankruptcy Court.

### 3. Estimation of Claims

The Debtors, prior to the Effective Date, and the Liquidation Trustee after the Effective Date, and as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to such Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under this Plan (including for purposes of Distributions), and the relevant Debtor or the Liquidation Trustee (as the case may be) may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim.

### 4. Offer of Judgment

The Debtors, before the Effective Date, and the Liquidation Trustee, after the Effective Date and as applicable, are authorized to serve upon a Holder of a Disputed Claim an offer to allow judgment to be taken on account of such Disputed Claim, and, pursuant to Bankruptcy Rules 7068 and 9014, Federal Rule of Civil Procedure 68 shall apply to such offer of judgment. To the extent the Holder of a Disputed Claim must pay the costs incurred by the Debtors or a Liquidation Trustee, after the making of such offer, the Debtors or the Liquidation Trustee, as applicable, may set off such amounts against the amount of any Distribution to be paid to such Holder without any further notice to or action, order or approval of the Bankruptcy Court.

### ARTICLE X
### CONFIRMATION OF THE PLAN

#### A. Conditions Precedent to Confirmation

The Bankruptcy Court shall not be requested to enter the Confirmation Order unless and until the following conditions have been satisfied or duly waived pursuant to Section X.C below:

1. The Disclosure Statement Order shall have been entered and shall not have been stayed, modified, or vacated on appeal.

2. This Plan, the Plan Supplement and the Confirmation Order shall each be in form and substance reasonably acceptable to the Debtors, the Committee, and the AHG.

3. An order approving the Committee Settlement Agreement shall have been entered and shall not have been stayed, modified or vacated on appeal.

B.      **Conditions Precedent to the Effective Date**

The Effective Date will not occur, and the Plan will not be consummated, unless and until the following conditions have been satisfied or duly waived pursuant to Section X.C below:

1.      The Confirmation Order shall be in full force and effect, and no stay thereof shall be in effect.

2.      The Liquidation Trust Agreement shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws, and the Trust Accounts pursuant to the Liquidation Trust Agreement shall be created and funded as set forth in the Plan.

3.      The Liquidation Trustee shall have been appointed and have accepted his or her appointment.

4.      All other documents and agreements necessary to implement this Plan on the Effective Date shall have been executed and delivered to the required parties and, to the extent required, filed with the applicable Governmental Unit in accordance with applicable laws.

5.      The Professional Fee Escrow Account shall be created and funded as set forth herein.

6.      All other actions required to be taken in connection with the Effective Date shall have occurred.

C.      **Waiver of Conditions to Confirmation or the Effective Date**

Each condition to Confirmation set forth in Section X.A and the conditions to the Effective Date set forth in Section X.B may be waived in whole or in part at any time by the joint agreement of the Debtors, the Committee, and the AHG without an order of the Bankruptcy Court.

D.      **Effect of Nonoccurrence of Conditions to the Effective Date**

The Debtors reserve the right to seek to withdraw this Plan at any time prior to the Effective Date upon failure to satisfy the conditions set forth in Section X.B. If this Plan is withdrawn pursuant to this Section: (1) each of this Plan and the Confirmation Order shall be null and void in all respects, including with respect to (a) the assumption, assumption and assignment or rejection of Executory Contracts and Unexpired Leases and (b) the releases described in Section X.F.3; and (2) nothing contained in this Plan or the Confirmation Order shall (a) constitute a waiver or release of any Claims by or against, or any Interest in, any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest.

E.      **Nonconsensual Confirmation**

Because Class 5 is conclusively presumed to have rejected this Plan, the Debtors request that the Bankruptcy Court confirm this Plan in accordance with section 1129(b) of the Bankruptcy Code with respect to such non-accepting Classes, and this Plan shall constitute a motion for such relief. The Debtors reserve the right, without any delay in the occurrence of the Combined Hearing or the Effective Date, to amend this Plan in accordance with Section XII.A.

F.      **Effect of Confirmation**

1.      **Dissolution of Official Committees**

On the Effective Date, the Committee and any other statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from any further authority, duties, responsibilities and obligations related to, or arising from, the Chapter 11 Cases, except that the Committee shall continue in existence and have standing and capacity to prepare and prosecute applications for the payment of fees and reimbursement of expenses incurred by the Committee or its respective Professionals.

2.        **Exculpation**

Except as otherwise specifically provided in this Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission occurring on or after the Petition Date and prior to the Effective Date in connection with, relating to, or arising out of, postpetition conduct within the Chapter 11 Cases, the Disclosure Statement, this Plan, or any contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or this Plan, postpetition conduct within the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to this Plan.

3.        **Releases**

a.        **Releases by the Debtors**

On and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates from any and all Claims and Causes of Action, including any derivative claims on behalf of the Debtors that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Prepetition Credit Agreement, the DIP Credit Agreement, any loans by the Secured Parties, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.  Nothing herein shall in any way alter or impair the releases previously granted under the Committee Settlement Agreement.

Notwithstanding anything to the contrary in the foregoing paragraph, the releases and discharges set forth in this Section X.F.3.a: (i) do not release any post-Effective Date obligations of any party or Entity under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) do not affect the rights of Holders of Allowed Claims or Interests to receive Distributions under this Plan.

For the avoidance of doubt, and notwithstanding anything herein to the contrary, Claims and Causes of Action against the Debtors' directors and officers (other than Claims and Causes of Action against any of Alex Zyngier, Richard Miller, and Justin D. Pugh) shall not fall within the scope of any releases contained herein.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases herein, which includes by reference each of the related provisions and definitions contained herein.

b.        **Releases by Holders of Claims**

As of the Effective Date, except as otherwise provided herein, each Releasing Party is deemed to have released and discharged each Released Party from any and all Claims and Causes of Action, whether known or unknown, including any derivative claims on behalf of the Debtors that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' capital structure, the Prepetition Credit Agreement, the DIP Credit Agreement, any loans by the Secured Parties, the assertion or enforcement of rights and remedies against the Debtors, the Debtors' in-

or out-of-court restructuring efforts, intercompany transactions between or among a Debtor and another Debtor, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, or any contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the administration and implementation of this Plan, or the distribution of property under this Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, except for any claims related to any act or omission that is determined in a Final Order to have constituted actual fraud, willful misconduct or gross negligence.

Notwithstanding anything to the contrary in the foregoing paragraph, the releases and discharges set forth in this Section X.F.3.b: (i) do not release any post-Effective Date obligations of any party or Entity under this Plan, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan; and (ii) do not affect the rights of Holders of Allowed Claims or Interests to receive Distributions under this Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases herein, which includes by reference each of the related provisions and definitions contained herein.

### 4. Injunction

Except as otherwise expressly provided in this Plan or for Distributions required to be paid or delivered pursuant to this Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to this Plan, or are subject to exculpation pursuant to Section X.F.2 of this Plan, are enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Released Parties or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section X.F.2 of this Plan with respect to the Exculpated Parties): (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (d) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released pursuant to this Plan.

### 5. Closing of the Chapter 11 Cases

Upon the Effective Date, except for Meyer Burger (Holding) Corp.'s Chapter 11 Case, each of the Chapter 11 Cases shall be deemed closed. All contested matters and any adversary proceedings shall be administered and heard in the lead case of Meyer Burger (Holding) Corp., which shall remain open pending entry of an order of the Bankruptcy Court. Upon administering the Plan in full, the Liquidation Trust may seek authority from the Bankruptcy Court to close the case of Meyer Burger (Holding) Corp. in accordance with the Bankruptcy Code and the Bankruptcy Rules, and the requirements set forth in Local Rule 3022-1.

### G. Votes Solicited in Good Faith

Upon entry of the Confirmation Order, (1) the Debtors will be deemed to have solicited votes on this Plan in good faith and in compliance with the Bankruptcy Code and (2) pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale or purchase of any securities offered and sold under this Plan and any previous plan.

# ARTICLE XI
## RETENTION OF JURSIDCTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction to the maximum extent permitted by law, and non-exclusive jurisdiction to the extent otherwise, over all matters arising out of, and related to, the Chapter 11 Cases and this Plan, including, among other things, jurisdiction to:

A.       Allow, disallow, estimate, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of (1) any request for payment of any Administrative Expense Claim and (2) any and all objections to the amount, allowance, priority or classification of Claims or Interests;

B.       Grant or deny any applications for allowance of any Professional Fee Claims through and including the Effective Date;

C.       Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

D.       Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

E.       Decide or resolve any motions, adversary proceedings, contested matters and any other matters Filed in the Bankruptcy Court involving any Debtor or the Liquidation Trust that may be pending on the Effective Date or brought thereafter;

F.       Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Chapter 11 Cases, the Committee Settlement Agreement, this Plan, the Disclosure Statement, or the Confirmation Order;

G.       Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation or enforcement of this Plan, the Confirmation Order or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to this Plan or the Confirmation Order;

H.       Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with this Plan, in such manner as may be necessary or appropriate to consummate this Plan and the transactions contemplated hereby;

I.       Hear and determine any matter, case, controversy, suit, dispute or Cause of Action regarding the existence, nature and scope of the releases, injunctions and exculpation provided under this Plan, and issue injunctions, enforce the injunctions contained in this Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to implement, enforce or restrain interference by any Entity with respect to the consummation, implementation or enforcement of this Plan or the Confirmation Order, including the releases, injunctions and exculpation provided under this Plan;

J.       Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated or if Distributions pursuant to this Plan are enjoined or stayed;

51

K.       Determine any other matters that may arise in connection with or relate to this Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with this Plan, the Disclosure Statement, the Confirmation Order, or the Committee Settlement Agreement;

L.       Enforce, clarify, or modify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

M.       Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

N.       Assist in recovery of all assets of the Estates, wherever located;

O.       Enter a final decree or decrees closing the Chapter 11 Cases; and

P.       Hear any other matter over which the Bankruptcy Court has jurisdiction.

## ARTICLE XII
## MISCELLANEOUS PROVISIONS

**A.       Modification of the Plan**

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code, the Debtors reserve the right to alter, amend or modify this Plan before the Effective Date.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to this Plan without further order or approval of the Bankruptcy Court.  Holders of Claims that have accepted this Plan shall be deemed to have accepted this Plan as amended, modified or supplemented, if the proposed amendment, modification or supplement does not materially and adversely change the treatment of such Claim; provided, however, that any Holders of Claims who were deemed to accept this Plan because such Claims were Unimpaired shall continue to be deemed to accept this Plan only if, after giving effect to such amendment, modification or supplement, such Claims continue to be Unimpaired.

**B.       Conversion or Dismissal of Certain of the Chapter 11 Cases**

If the requisite Classes do not vote to accept this Plan or the Bankruptcy Court does not confirm this Plan with respect to any Debtor, such Debtor shall have the right to seek to have its Chapter 11 Case dismissed or converted, or to liquidate or dissolve itself under applicable nonbankruptcy law or chapter 7 of the Bankruptcy Code.

**C.       Inconsistency**

In the event of any inconsistency among this Plan, the Disclosure Statement or any exhibit or schedule to the Disclosure Statement, the provisions of this Plan shall govern.  In the event of any inconsistency among this Plan and any document or agreement Filed in the Plan Supplement, such document or agreement shall control.  In the event of any inconsistency among this Plan or any document or agreement Filed in the Plan Supplement and the Confirmation Order, the Confirmation Order shall control.  In the event of any inconsistency among this Plan or any document or agreement Filed in the Plan Supplement and the Committee Settlement Agreement, the Plan shall control.

**D.       Exhibits and Schedules**

All exhibits and schedules to this Plan (including, but not limited to, the Committee Settlement Agreement and the Plan Supplement) are incorporated into and constitute a part of this Plan as if set forth herein.

**E.       Exemption from Transfer Taxes**

Pursuant to section 1146(a) of the Bankruptcy Code, the transfer of any property under the Plan (including transfers to and from the Liquidation Trust), the making or delivery of any instrument of transfer pursuant to, in

implementation of or as contemplated by, the Plan or the revesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated by, the Plan shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any stamp tax, transfer tax or similar tax or fee.

**F.    Severability**

If prior to the entry of the Confirmation Order, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void or unenforceable, the Bankruptcy Court may, at the request of the Debtors, alter and interpret such term or provision to the extent necessary to render it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as so altered or interpreted.  Notwithstanding any such holding, alteration or interpretation, the remaining terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**G.    Successors and Assigns**

Except as expressly provided otherwise in this Plan, the rights, benefits and obligations of any Person named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign, affiliate, representative, beneficiary or guardian, if any, of each Person.

**H.    Service of Documents**

Any pleading, notice or other document required by this Plan or the Confirmation Order to be served on or delivered to counsel to: (1) the Debtors; (2) the AHG; and (3) the Committee via electronic mail, overnight delivery service, or hand delivery shall be made at the respective addresses below:

**The Debtors**

Paul N. Heath
Brendan J. Schlauch
Jason M. Madron
Zachary J. Javorsky
Nicholas A. Franchi
RICHARDS, LAYTON & FINGER, P.A.
One Rodney Square
9210 North King Street
Wilmington, DE 19801
Email: heath@rlf.com
        schlauch@rlf.com
        madron@rlf.com
        javorsky@rlf.com
        franchi@rlf.com

**The AHG**

Curtis S. Miller
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347

Email: cmiller@morrisnichols.com

-and-

Debra A. Dandeneau
452 Fifth Avenue
New York, NY 10018
Email: debra.dandeneau@bakermckenzie.com

**The Creditors' Committee**

Seth A. Niederman
Stephanie Slater Ward
FOX ROTHSCHILD LLP
1201 N. Market Street, Suite 1200
Wilmington, DE 19899
Email:   sniederman@foxrothschild.com
              sward@foxrothschild.com

-and-

Jesse M. Harris
FOX ROTHSCHILD LLP
2001 Market Street, 17TH Floor
Philadelphia, PA 19103
Email:   jesseharris@foxrothschild.com